**HARRIS TRUST AND SAVINGS BANK,** an Illinois banking corporation, not individually but as Trustee, and LaSalle National Bank, a national banking association, not individually but as Trustee, Plaintiffs-Appellants,

v.

**E-II HOLDINGS, INCORPORATED,** a Delaware corporation, and American Brands, Incorporated, a Delaware corporation, Defendants-Appellees.

No. 90-1095.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1990.

Decided Feb. 21, 1991.

Rehearing and Rehearing In Banc
Denied May 3, 1991.

James E. Spiotto, Ann E. Acker, William P. Smith, Wendy Grossman, Kathryn M. Gleason, Chapman & Cutler, Chicago, Ill., for plaintiffs-appellants.

Terry M. Grimm, Timothy J. Rivelli, Gregory J. Bueche, Winston & Strawn, Chicago, Ill., Stephen A. Marshall, Abraham H. Levin, Gerald Harris, Rubin, Baum, Levin, Constant & Friedman, New York City, William Bruce Hoff, Jr., Mayer, Brown & Platt, Thomas M. Dethlefs, Jay Erens, Hopkins & Sutter, Chicago, Ill., Robert B. Mazur, Eric M. Roth, Wachtell, Lipton, Rosen & Katz, Daniel J. O'Neill, Chadbourne & Parke, New York City, for defendants-appellees.

Before WOOD, Jr., COFFEY, and KANNE, Circuit Judges.

HARRINGTON WOOD, Jr., Circuit Judge.

Technically, they are high yield debt securities, but in common parlance we call them junk bonds. It is an unflattering and unwelcome appellation, due in no small part to the fact that oftentimes the securities are, quite literally, junk. *See* Kuhn, *Junk: The Weak and the Strong*, FORTUNE, Oct. 23, 1989, at 17. The appellants, trustees of high yield debt securities with a face value of $1.5 billion, are before this court in an attempt to assuage their fears that the worst has occurred. We cannot provide the reassurance they seek, however; we lack subject matter jurisdiction over most of the complaint and the remainder fails to state a claim.

The facts are straightforward and, for purposes of this decision, undisputed.[1] In 1987, BCI Holdings Corp. ("BCI") engineered a $6.2 billion leveraged acquisition of Beatrice Companies, Inc ("Beatrice").

During the reshuffling that ensued, BCI created E–II Holdings, Inc. ("E–II"), and capitalized it with an initial portfolio of fifteen business concerns that were once part of Beatrice. Soon thereafter, E–II made a registered public offering of $1.5 billion in high yield debt securities: $750,000,000 of 12.85% senior subordinated notes and $750,000,000 of 13.05% subordinated debentures. The trustee under the note indenture was Harris Trust and Savings Bank ("Harris"). The trustee under the debenture indenture[2] was LaSalle National Bank ("LaSalle") (collectively, the "Trustees").

E–II was not immune to the takeover mania that victimized the 1980s, and in December 1987 it launched a hostile takeover bid for American Brands, Inc. ("American Brands"). American Brands countered with a bid for E–II—the so-called "pac man" defense. And when the dust settled, it was American Brands, and not E–II, that prevailed.

Following its unsuccessful takeover attempt, E–II was involved in a number of business transactions that gave rise to uneasiness on the part of the Trustees. For example, on February 29, 1988, E–II became a wholly owned direct subsidiary of American Brands. On July 1, 1988, American Brands sold E–II to McGregor Acquisition Corp. ("McGregor").[3] And one day after that sale, McGregor made a "capital contribution" to E–II of all of the issued and outstanding stock of its subsidiary, Faberge, Inc. ("Faberge"), in exchange for 840 shares of E–II and a "dividend" of $925,000,000. In all, the Trustees have concerns about some fourteen different transactions (the parties refer to them as "Extraordinary Transactions") occurring between February and December of 1988.

The Trustees were not alone in their concern. A significant number, though not a majority, of investors filed notices of default with the Trustees during the sum-

---

1. A more detailed description of the facts may be found in the district court opinion. *See Harris Trust & Sav. Bank v. E–II Holdings, Inc.,* 722 F.Supp. 429 (N.D.Ill.1989).

2. The note indenture and the debenture indenture (collectively, the "Indentures") are identical with respect to all relevant matters in this suit.

3. McGregor is a subsidiary of the Riklis Family Corporation.

mer and fall of 1988. These notices alleged that a default had occurred because the transaction involving Faberge was in violation of the Indentures.[4]

The Trustees sought to quell their own concerns, as well as those of the investors, by going directly to the source. In addition to the officers' certificates and opinions of counsel required under the Indentures, the Trustees demanded that E–II provide additional information about the Extraordinary Transactions. In particular, the Trustees asked E–II to disclose the factual information on which the certificates and opinions were based. E–II was not accommodating, however; it provided the certificates and opinions required under the Indentures but did not disclose the factual bases of those certificates and opinions. E–II refused to provide the additional information on the ground that the Indentures did not provide such a right.[5]

In the Trustees' view, E–II's failure to cooperate placed them in a quandary the likes of Scylla and Charybdis. If they acted immediately and declared E–II in default, then the declaration could trigger cross-default provisions in other loan agreements and thereby catapult E–II into involuntary bankruptcy. And if it was later discovered that the Trustees were wrong and that E–II had not been in default, then the disgruntled investors would likely sue the Trustees. On the other hand, the Trustees were also amenable to suit if they failed to act and the investors later discovered that, in fact, E–II's actions had breached the Indentures' covenants. Neither course of action seemed prudent in

view of what the Trustees perceived as the insufficient nature of the information in their possession.

Paralyzed by indecision, the Trustees searched for someone to make their decision for them. On January 10, 1989, the Trustees filed a declaratory judgment action against E–II and asserted that the following issues were "matter[s] in dispute": [6]

a. Whether the acquisition of E–II by American Brands was in compliance with the terms of the Indentures and principles of applicable law and equity, including the implied covenants of good faith and fair dealing;

b. Whether the post-acquisition Extraordinary Transactions ... were in compliance with the terms of the Indentures and principles of applicable law and equity, including the implied covenants of good faith and fair dealing;

c. Whether E–II has complied with the provisions of the [Trust Indenture Act ("Act"), 15 U.S.C. §§ 77aaa-bbbb,] including but not limited to Section 314, [id. § 77nnn,] which requires evidence of compliance with indenture provisions;

d. Whether an Event of Default has occurred on the Notes or the Debentures within the meaning of Section 315 of the [Act, 15 U.S.C. § 77ooo];

e. What action the Trustees should take with respect to the Notices of Default ... received ...;

f. Whether or not the assets remaining in E–II are sufficient to generate sufficient revenues to ensure payment of

---

**4.** Under section 6.01(3) of the Indentures, a "Default" occurs if E–II "fails to comply in any respect with any of its other agreements contained in the Securities or this Indenture." This "Default" does not become an "Event of Default" (allowing the Trustees to accelerate payment, etc.) until E–II (1) receives written notice from the Trustees or a majority of the investors and (2) fails to correct the Default within 30 days of receiving the notice. Indentures § 6.01.

**5.** E–II apparently would have provided some of the information on a confidential basis, but the Trustees did not believe that their fiduciary duties would allow them to withhold information from the investors and they declined E–II's offer.

**6.** In an additional count, the Trustees sought indemnification for their costs and attorneys' fees for bringing the action and for their costs in administering the trusts. E–II sought dismissal on the ground that the count provided no indication of a controversy, the Trustees failed to respond to E–II's argument, and the district court granted the motion and dismissed the count on the basis of that failure. On appeal, the Trustees make mention of this count but do not otherwise contest the decision below, a course of conduct that we interpret to mean that the Trustees are not appealing this portion of the district court's order.

principal, interest, and sinking fund obligations of the Notes and Debentures;

   g.  Whether any future asset sales by E–II can be permitted and, if so, under what circumstances; and

   h.  To what information are the Trustees entitled in order to determine if unusual occurrences, such as the Extraordinary Transactions, violate the terms of the Indentures.

The Trustees closed their complaint with a request for a judicial declaration concerning each of these "matter[s] in dispute."[7]

E–II,[8] however, and subsequently the district court, were hard pressed to determine the Trustees' positions with respect to the alleged "matter[s] in dispute." And in fact, the Trustees had failed to take a position with respect to virtually every one of the issues for which they sought a judicial declaration. The Trustees did argue that they were entitled to more information than E–II was giving them (the eighth "matter in dispute"), but otherwise peppered their submissions with qualifiers—"may," "could," and other verbalisms that failed to indicate a stance.

On E–II's motion to dismiss under rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the district court held that it had no subject matter jurisdiction to decide those issues for which the Trustees failed to take a position. That failure, the district court concluded, precluded jurisdiction because it evidenced the lack of a case or controversy. As to the dispute over the Trustees' entitlement to additional information, the district court concluded that a case or controversy existed because the parties disputed the quantity and quality of disclosure required of E–II. The district court then found no legal basis to support the Trustees' claim that they were entitled to more information than E–II was willing to disclose. As such, it dismissed the request for information on the ground that it failed to state a cause of action. The district court also denied a subsequent motion by the Trustees to alter or amend the judgment.

■ On appeal, the Trustees continue to assert that it is neither necessary nor appropriate for them to commit to a position. Indeed, they assert that their request for "judicial guidance" and "judicial instruction" is the paradigm on which all declaratory judgment cases are built. And in so doing, they seal their fate: "Frequently, an issue of this sort will come before [this court] clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change ... is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf."[9]

As a predicate to relief, the Declaratory Judgment Act requires that the case be one of "actual controversy." 28 U.S.C. § 2201(a). That predicate, which tracks the "cases" or "controversies" requirement of article III, saves the statute from unconstitutionally expanding the federal courts' jurisdiction. *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (upholding Act); U.S. CONST. art. III, § 2.[10] The often unspoken,

---

**7.** The Trustees' complaint stated that jurisdiction was premised on diversity of citizenship as well as the notion that section 322 of the Act, 15 U.S.C. § 77vvv, provided a private right of action. In light of the fact that complete diversity of citizenship exists between the plaintiffs and the defendants, we do not address the argument that the Act gives rise to a private cause of action.

**8.** The initial complaint listed only E–II as a defendant. Later, American Brands became a party defendant after the district court granted its motion to intervene. The interests of E–II and American Brands on this appeal do not appear to diverge and, for convenience, future references to E–II shall also include American Brands.

**9.** *Morrison v. Olson*, 487 U.S. 654, 699, 108 S.Ct. 2597, 2623, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting).

**10.** As the Supreme Court pointed out in *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941):

   The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having ad-

but yet obvious, corollary of the "actual controversy" predicate is that the dispute must exist *between the parties to the declaratory judgment action. See Aetna Life*, 300 U.S. at 242, 57 S.Ct. at 464 ("There is here a dispute between parties who face each other in an adversary proceeding.").

And if *Aetna Life* and common sense were not enough of a guide, the Supreme Court squarely rejected the Trustees' argument in *Princeton Univ. v. Schmid*, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982) (per curiam).[11] In *Schmid*, the appellee was convicted and fined by a New Jersey trial judge, but his conviction was reversed by the state supreme court. Princeton University, an intervenor in the proceedings before the state supreme court, sought review before the Supreme Court. The state of New Jersey also requested review but opined that New Jersey " 'deems it neither necessary nor appropriate to express an opinion on the merits of the respective positions of the private parties to this action.' " *Id.* at 102, 102 S.Ct. at 868. The Court, warning that it did not sit "to give advisory opinions about issues as to which there are not adverse parties before [it]," held that New Jersey's presence in the case did not provide a basis for subject matter jurisdiction over the appeal. *Id.*[12]

Like the state of New Jersey in *Schmid*, the Trustees have declined to express an opinion on the merits.[13] And as in *Schmid*, that failure evidences the lack of a case or controversy and, therefore, the lack of subject matter jurisdiction. *Schmid* is dispositive on this issue, and the district court's dismissal under rule 12(b)(1) was proper.[14]

■ As a side note, we are not unmindful of the judicial maxim that the "law ought not make trusteeship so hazardous that responsible individuals and corporations will shy away from it." *Dabney v.*

---

verse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**11.** The Trustees (and E-II, for that matter) failed to bring *Schmid* to our attention. Of those cases that the Trustees did bring to our attention, not one of them allowed a party to litigate without taking a position.

**12.** In an attempt to compensate for their own failure to take a position, the Trustees argue that they have standing to raise issues on behalf of "certain Holders" and point to the fact that their complaint alludes to the position of that undefined grouping. Our jurisdictional analysis does not begin and end with the question of standing, however. The Trustees and E-II are the only parties to this suit and the Trustees, regardless of the capacity in which they appear, have failed to establish a dispute *between the parties* as to a majority of the "matter[s] in dispute."

The Trustees also make arguments concerning the importance of the issues that are before this court, and they miss few opportunities to emphasize the dollar value of the securities involved. Yet their pleas are unavailing. The entire premise of article III and the body of precedent interpreting that provision is that federal courts should not make rulings merely because the underlying issues are interesting or important. Federal courts decide cases and controversies, and the majority of the issues presented by the Trustees, regardless of their

importance to modern society, do not arise within the context of a case or controversy.

**13.** Indeed, the Trustees continually lament that they do not have sufficient information to allow them to take a position.

**14.** The Trustees' complaint is also troublesome for additional reasons. For example, the complaint fails to allege the injury that the Trustees or investors have sustained or are in immediate danger of sustaining, thereby failing to indicate standing to seek a declaratory judgment. *See Vickers v. Henry County Sav. & Loan Ass'n*, 827 F.2d 228, 231–32 (7th Cir.1987). Moreover, the Trustees request a determination of whether, and under what circumstances, future asset sales may be permitted. This request, premised on pure speculation as to what the future might hold, is akin to a hypothetical question asked by a law school professor; it does not raise issues that are ripe for judicial determination. *See Aetna Life*, 300 U.S. at 241, 57 S.Ct. at 464 (federal court may not issue opinion "advising what the law would be upon a hypothetical state of facts"). As such, the Trustees' counsel (or a law school professor) may attempt to answer this question, but a federal court should not. J. MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE § 57.12, at 57–113 (2d ed. 1948 & Supp.1990–91) ("The [Declaratory Judgment] Act is not designed to eliminate the function of attorneys.") (citing *Hendrix v. Poonai*, 662 F.2d 719 (11th Cir.1981)); *see also Fitzgerald v. McChesney*, 336 F.2d 905, 910 (D.C.Cir.1964) (Declaratory Judgment Act "was never intended as a device for relegating to the courts responsibilities reposed initially in private parties").

*Chase Nat'l Bank,* 196 F.2d 668, 675 (2d Cir.1952) (Hand, J.), *cert. dismissed,* 346 U.S. 863, 74 S.Ct. 102, 98 L.Ed. 374 (1953). That maxim, however, does not extend our jurisdiction. And as should be self-evident, the requirements of article III are not met when parties merely allege, as the Trustees have effectively done here, that they are " 'at a loss to know what course to pursue.' " [15] In our view, the vision of trustees without judicial guidance, however unpleasant, is eclipsed by a more disturbing vision—trustee after trustee (as well as those in analogous positions) coming into federal court and pleading, "We do not know what to do, Judge. Give us some instruction." [16]

The only issue in the Trustees' complaint that does appear to present a case or controversy is the dispute over the quantity and quality of information that the Trustees are entitled to receive from E–II. This dispute fails to clear a different hurdle, however; the Trustees have not put forth a cognizable legal basis under which they might be entitled to the information that they seek. *See* Fed.R.Civ.P. 12(b)(6). Of the three bases offered—express covenant, implied covenant, and the Act—not one can support the Trustees' demand for additional information.[17]

■ The first potential basis for relief—the express language of the Indentures—is a latecomer to this litigation; the Trustees failed to raise this argument until they filed a motion to alter or amend the judgment. Prior to that time, in their response to E–II's motion to dismiss, the Trustees had candidly stated: "Obtaining the information the Trustees have requested, though not expressly mentioned in the Trust Indentures, is not inconsistent with their provisions ...." And after reading this statement, the district court found that the "Trustees admit[ted] that there is no specific provision in the Indentures entitling them to the information they request."

Setting aside the issue of whether the Trustees have made a binding admission, the Trustees' statement indicates a conscious, deliberate waiver of a legal argument. *See Farnham v. Windle,* 918 F.2d 47, 51 (7th Cir.1990) (failure to raise legal

**15.** J. Moore & J. Lucas, *supra,* § 57.12, at 57–112 to –113 (quoting *M & M Transp. Co. v. U.S. Indus., Inc.,* 416 F.Supp. 865 (S.D.N.Y.1976)); *see also Crowley Cutlery Co. v. United States,* 849 F.2d 273, 276 (7th Cir.1988) ("You cannot go to a federal court for advice on the legality of a proposed course of action. You must be a party to an existing legal dispute.").

Although the Trustees dispute the charge that they are asking the court to do all of their work, one need look no further than their fifth "matter in dispute" for sufficient evidence to support the charge.

**16.** For purposes of clarification, one should not imply from our holding that the Trustees must declare a default under the Indentures before their claim will be justiciable. As we read it, the heart of the Trustees' complaint seeks an interpretation of the Indentures, not a declaration that a default has occurred. As such, we would analyze it in a manner similar to the Trustees' claim that they are entitled to more information than E–II is willing to disclose, a claim for which we find subject matter jurisdiction; we have not required the Trustees to declare E–II in default before filing that request for an interpretation of the Indentures.

While the relief requested as to the eighth "matter in dispute" is in some sense hypothetical (in that the Trustees need not declare a default if the court determined that E–II's ac-

tions were not in compliance with the Indentures), we would note that all declaratory relief is in some sense hypothetical. *NBA v. SDC Basketball Club, Inc.,* 815 F.2d 562, 566 n. 2 (9th Cir.1987), *cert. denied,* 484 U.S. 960, 108 S.Ct. 362, 98 L.Ed.2d 386 (1987). The more important consideration is whether the case "presents a sufficiently concrete case and controversy upon which relief properly may be fashioned." *Id.* And we believe, under the facts as presented to us, that the issues presented by the eighth "matter in dispute" are sufficiently concrete and ripe for review; we can think of no useful purpose that would be served by requiring the Trustees to send E–II a notice of default before filing the complaint. On the contrary, requiring the Trustees to file a notice of default could trigger cross-default provisions in other loan agreements and needlessly force E–II into involuntary bankruptcy.

**17.** This claim may be dismissed under rule 12(b)(6) only if the Trustees can prove no set of facts upon which relief may be granted. *Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1326 (7th Cir.1990). As always, the standard of review for dismissals under rule 12(b)(6) is de novo. *Id.* Further, we assume that all well-pleaded allegations are true and shall draw all reasonable inferences in the light most favorable to the Trustees. *Id.*

argument in opposition to motion to dismiss results in waiver). Having waived the argument, the Trustees could not thereafter raise it in a motion to alter or amend the judgment. The district court analyzed and rejected the belated argument that section 11.05 of the Indentures [18] expressly provided a right to the information sought, but it was not required to make such an effort. Motions to alter or amend a judgment "cannot be used to raise arguments which could, and should, have been made before the judgment issued," *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986); *see Dahnke v. Teamsters Local 695*, 906 F.2d 1192, 1196 n. 3 (7th Cir.1990); neither the district court nor this court is obliged to examine arguments that are raised in an untimely fashion.[19]

Even if we were to reach the merits on this issue, we would feel compelled to agree with the district court. The argument that section 11.05 expressly requires E–II to provide the requested information is more wishful thinking than anything else. As the district court observed, section 11.05 is limited by its express terms to a "certificate" or "opinion." Nowhere does it require E–II to disclose the facts underlying these documents. Indeed, when more disclosure is necessary, the Indentures make express provisions for that disclosure. *See, e.g.,* Indentures § 4.07 (if E–II knows of a "Default" or "Event of Default," "the certificate shall describe any such Default or Event of Default and its status"); *Id.* § 5.01(5) (certificate shall contain a statement of compliance and have attached "arithmetic computations" demonstrating compliance with the Consolidated Interest Expense Ratio).

The second potential basis for relief—the implied covenant of good faith and fair dealing—presents a more difficult question. The parties agree that New York law applies and that every contract governed by New York law contains an implied covenant to perform the contract fairly and in good faith. *See Rowe v. Great Atlantic & Pac. Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978). The parties are in relatively sharp disagreement, however, as to what that implied covenant requires in this case.

Courts often use broad and unqualified language in describing the content of the implied covenant of good faith. *See, e.g., Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1516–18 (S.D.N.Y.1989). In contrast to their broad definitional language, however, their analyses indicate that the "party who asserts the existence of an implied-in-fact covenant bears a heavy burden." *Rowe*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566. And from these analyses, we discern that New York law appears to invoke the implied covenant of good faith and fair dealing only in those instances where one party has violated the spirit, although not the letter, of a contract. *See Metropolitan Life*, 716 F.Supp. at 1517 (implied covenant appropriate where, while the express terms of the contract "may not have been technically breached, one party has nonetheless effec-

---

**18.** Section 11.05 states:
Each certificate or opinion with respect to compliance with a condition or covenant in this Indenture shall include:
(1) a statement that the person making such certificate or opinion has read such covenant or condition;
(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;
(3) a statement that, in the opinion of such person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4) a statement as to whether or not, in the opinion of such person, such condition or covenant has been complied with, and such other opinions as the Trustees may reasonably request; *provided, however,* that with respect to matters of fact an Opinion of Counsel may rely on an Officers' Certificate or certificates of public officials.

**19.** Another untimely argument is the Trustees' assertion that E–II has not even provided the "certificates" and "opinions" required under the Indentures. This challenge to the district court's factual findings was not specifically raised until the Trustees filed their reply brief, and is therefore waived. *See* 7TH CIR.R. 28(f).

tively deprived the other of those express, explicitly bargained-for benefits."); *see also Don King Prods., Inc. v. Douglas*, 742 F.Supp. 741, 767 (S.D.N.Y.1990) (implied covenant "simply 'ensures ...' that parties are not unfairly denied 'express, explicitly bargained-for benefits.' ") (quoting *Metropolitan Life*, 716 F.Supp. at 1517). As such, we must determine whether the Trustees are seeking to enforce "promises which a reasonable person in the position of the [Trustees] would be justified in understanding were included [in the Indentures]." *Havel v. Kelsey–Hayes Co.*, 83 A.D.2d 380, 445 N.Y.S.2d 333 (N.Y.App. Div.1981); *see also Rowe*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 ("Thus, a party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole.").

For example, in *Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), the holders of convertible debentures had an express contractual right to notice of the issuer's intent to redeem the debentures, notice that would have allowed the debenture holders to determine whether or not they wanted to exercise the conversion privilege attached to their securities. The indenture, however, did not clearly spell out the form of notice required, and the issuer gave notice that would have technically complied with the indenture but was otherwise ineffective. The court, after analyzing the matter, was unwilling to allow the issuer to hide behind the vague notice provisions in the indenture. It held that the face of the indenture specifically evidenced that the debenture holders had bargained for notice, and interpreted the indenture to require reasonable notice in the absence of more specific contractual language. Thus, the court invoked the implied covenant of good faith and fair dealing to prevent the issuer from depriving the debenture holders of a "bargained-for" right—notice. *See also Pittsburgh Terminal Corp. v. Baltimore & O.R.R.*, 680 F.2d 933 (3d Cir.), *cert. denied*, 459 U.S. 1056, 103 S.Ct. 475, 74 L.Ed.2d 621 (1982).

In *Metropolitan Life*, the investment grade of RJR Nabisco's bonds fell after the company was the subject of a leveraged buyout. 716 F.Supp. at 1505–06. The bondholders sued, alleging that the leveraged buyout deprived them of the intended object of their contract—the purchase of investment-grade securities. The court was not impressed, however. After noting that *Van Gemert* and *Pittsburgh Terminal* protected the benefit of a bargain "as determined from the face of the contracts at issue," the court proceeded to distinguish those cases. *Id.* at 1517. The bondholders, it concluded, were seeking something quite beyond a meaningful fulfillment of the indentures' express terms.[20] Instead, the bondholders' demands appeared to be founded upon the notion that the issuer had a duty not only to comply with the indentures, but to make sure that the bondholders " 'had made a good investment.' " *Id.* at 1520 (quoting *Gardner & Florence Call Cowles Found. v. Empire, Inc.*, 589 F.Supp. 669, 674 (S.D.N.Y.1984), *vacated on procedural grounds*, 754 F.2d 478 (2d Cir.1985)). And after lengthy analysis, the district court concluded that these demands sought to create an additional benefit for which the parties had not bargained. *Id.* at 1519 ("These plaintiffs do not invoke an implied covenant of good faith to protect a legitimate, mutually contemplated benefit of the indentures; rather, they seek to have this Court create an additional benefit for which they did not bargain."); *see also Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F.Supp. 976 (S.D.N.Y.1989).

Here, as in *Metropolitan Life*, the relevant contracts do not support the interpretation that the Trustees now advocate. The Trustees allude to the "fruits" of the investors' bargain but fail to demonstrate,

---

**20.** Indeed, the indentures permitted mergers and imposed no limitations on the assumption of debt.

especially in light of the limited requirements of section 11.05, how a reasonable investor would be justified in assuming that E–II promised to disclose the factual bases underlying its certificates and opinions.[21] Indeed, their language suggests, without basis, that E–II has a continuing duty to reassure the investors that they have made a good investment—the same type of argument rejected in *Metropolitan Life*. New York law does not, as the Trustees would have us believe, imply a covenant merely on the basis of strong societal concerns; the foundation of the implied covenant is the express covenant, and the Trustees' claim simply fails to provide that foundation.

True, the Indentures do not preclude the Trustees from obtaining the information they now seek, but that does not mean that we should imply such a right of access. *See Hartford Fire*, 723 F.Supp. at 992 ("The fact that these terms appeared nowhere in the Indenture does not mean the court should now imply them to protect the parties' bargain."). "In fact, the opposite appears to be true." *Id.* As the court in *Metropolitan Life* stated:

> [T]here admittedly is not an explicit Indenture provision to the contrary of what plaintiffs now claim the implied covenant requires. That absence, however, does *not* mean that the Court should imply into those very same indentures a covenant of good faith so broad that it imposes a new, substantive term of enormous scope.... *especially* where there has been no breach of the parties' bargained-for contractual rights on which the implied covenant necessarily is based.

716 F.Supp. at 1519.

Implying the covenant requested by the Trustees would also be "troublesome" in view of the fact that the Indentures "could easily have been drafted to incorporate expressly the terms the [Trustees] now urge this court to imply." *Hartford Fire*, 723

F.Supp. at 992. Section 603(f) of the Model Debenture Indenture Provisions even provides a basic model for such a provision:

> Except as otherwise provided in Section 601:
>
> . . . .
>
> (f) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, coupon or other paper or document but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney....

*See also* AMERICAN BAR FOUNDATION, COMMENTARIES ON MODEL DEBENTURE INDENTURE PROVISIONS 61 (1971) ("Some provisions are added [to the indenture] with respect to the Trustee's right to investigate the accuracy of the facts stated in such a document. The Model Provisions confer such rights on the Trustee in Section 603(f)."). Moreover, the investors appear to be sophisticated institutional investors, and are thereby charged with some knowledge of the market and the provisions that could have been included in the Indentures. *Compare Metropolitan Life*, 716 F.Supp. at 1508, 1518 ("sophisticated investors"), *and Hartford Fire*, 723 F.Supp. at 992 (charging investors with knowledge of indenture provisions available to limit risk of takeover), *with Van Gemert*, 520 F.2d at 1383 ("less sophisticated investors"); *see also Indiana Nat'l Bank v. Mobil Oil Corp.*, 578 F.2d 180, 186 n. 11 (7th Cir.1978) (crux of *Van Gemert* "was the protection of unsophisticated investors").

■ The third potential basis for relief—the Act—fares no better than its predecessors. Section 314(e) of the Act specifies

---

**21.** We might have reached a different conclusion if the Indentures did not specifically and unambiguously define the required content of the certificates or opinions. The Indentures define the required content, however, and that definition is not so ambiguous as to allow us to

imply a reasonableness requirement akin to that implied by the Second Circuit in *Van Gemert*. *See Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir.1985) (*Van Gemert* analysis does not apply when contractual provisions are unambiguous).

the "evidence of compliance" (with a condition or covenant) that an issuer must furnish to an indenture trustee. 15 U.S.C. § 77nnn(e).[22] That section (like section 11.-05 of the Indentures) requires certificates and opinions but does not require issuers to disclose the factual bases of certificates or opinions. Moreover, although section 314(a)(2) of the Act, 15 U.S.C. § 77nnn(a)(2), allows the SEC to promulgate rules or regulations that could require E–II to provide additional "evidence of compliance," the SEC to date has failed to promulgate any such rule or regulation. *See* 17 C.F.R. §§ 260.0–1 to 260.14a–1. Last, section 314(f), dispositively states:

> Nothing in this section shall be construed either as requiring the inclusion in the indenture to be qualified of provisions that the obligor upon the indenture securities shall furnish to the indenture trustee any other evidence of compliance with the conditions and covenants provided for in the indenture than the evidence specified in this section, or as preventing the inclusion of such provisions in such indentures, if the parties so agree.

*Id.* § 77nnn(f). This freedom-of-contract mentality leaves no room for the interpretation that the Trustees would thrust upon the Act.

The doors to the federal courthouse remain open to the Trustees as they remain open to all litigants: subject to such prerequisites as subject matter jurisdiction and stating a cognizable claim. Until the Trustees are willing and able to meet those prerequisites, however, we must turn them away. The decision of the district court is

AFFIRMED.

---

**22.** This portion of the statute provides:

> Each certificate or opinion with respect to compliance with a condition or covenant provided for in the indenture shall include (1) a statement that the person making such certificate or opinion has read such covenant or condition; (2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (3) a statement that, in the opinion of such person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and (4) a statement as to whether or not, in the opinion of such person, such condition or covenant has been complied with.

