Jerry R. SUMMERS, Scott R. Lewis, and Laurie Stanton, individually and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

STATE STREET BANK AND TRUST COMPANY, UAL Corporation Employee Stock Ownership Plan, and UAL Corporation Supplemental Employee Stock Ownership Plan, Defendants–Appellees.

No. 96–2083.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1996.

Decided Jan. 6, 1997.

Michael J. Freed, Christopher J. Stuart, Much, Shelist, Freed, Denenberg & Ament, Chicago, IL, Steve W. Berman, Clyde A. Platt, Jr. (argued), Clifford A. Cantor, Hagens & Berman, Seattle, WA, and Kevin P. McBride, Salt Lake City, UT, for Plaintiffs–Appellants.

Susan Getzendanner, Charles F. Smith (argued), John K. Lyons, Pauline Hyun–Soo Yoo, Skadden, Arps, Slate, Meagher & Flom (Illinois), Chicago, IL, and David L. McClenahan and David F. McGonigle, Kirkpatrick &

Lockhart, Pittsburgh, PA, for Defendants–Appellees.

Before POSNER, Chief Judge, and FLAUM and EVANS, Circuit Judges.

POSNER, Chief Judge.

This is a class action on behalf of employees of United Airlines who are participants in United's Employee Stock Ownership Plan against State Street Bank and Trust Company, the trustee of the ESOP, an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA). See 29 U.S.C. §§ 1002(2)(A), (3), 1003(a). (Actually there are two plans, but we shall suppress that and several other details and nuances in order to make our opinion easier to understand.) An ESOP is an employee benefit plan that owns shares of the employer—in some cases, including this one, shares that confer a controlling interest. This novel incarnation of syndicalism has been criticized for underdiversification (the employees' retirement assets, when as here the benefits funded by the plan are retirement benefits, are in the securities of a single corporation—their employer) and undeserved tax advantages. These criticisms have no bearing on this suit, which charges State Street with having violated its fiduciary obligations to the participants in the plan by failing to perform the duties that the plan document imposed on it. Damages in excess of a billion dollars are sought. The district judge dismissed the suit for failure to state a claim.

■ The suit arises out of an audacious deal between United Airlines and unions representing its pilots, mechanics, and other employees. (An earlier stage of the deal was before the court in *Air Line Pilots Ass'n v. UAL Corp.*, 874 F.2d 439 (7th Cir.1989).) In exchange for accepting substantially lower wages and fringe benefits for a substantial period, the employees' retirement plan would get voting control of the company and majority equity ownership. The deal gave the employees other desired changes in the governance of the corporation, as well as an increased likelihood of retaining their jobs—since the company's labor costs would be

substantially lower as a result of the give ups—plus certain express job protections. The existing shareholders were required to exchange their shares for shares in a recapitalized United, receiving for each old share one half of a new share plus cash that United raised largely by means of a huge issue of debentures that was made possible by the employees' wage and benefits concessions, which by substantially reducing the company's labor costs increased its net worth and hence its borrowing power.

To fund the ESOP, United created a special issue of preferred stock carrying a 7 percent dividend. The number of preferred shares was set equal to 55 percent of the total number of common plus preferred shares. Rather than giving the preferred shares to the ESOP outright, United gave it the money to buy the shares from United. But this meant that in substance the transfer was a gift to the ESOP rather than a sale, since when the dust settled, the ESOP had paid nothing for the stock and United had received nothing in exchange. Which further meant that, abstracting from tax and regulatory considerations about which more shortly, the price per share was meaningless economically. If the price was high, United would have to advance more money to the ESOP to enable the latter to buy the shares, but the higher payment would come right back to United when the ESOP bought the shares at the higher price.

The reason for this dummy sale was to obtain tax benefits from United's borrowing of the money to finance the ESOP's buyout of the shareholders. See 26 U.S.C. § 404(a)(9). The higher the price of the shares "sold" to the ESOP, the greater the further tax advantage to United from the fact that (subject to irrelevant limitations) an employer is allowed to deduct his contributions to an ESOP or other employee benefit plan when they are made, while the employee does not have to pay income tax on the benefits he receives under the plan until he takes them out. That will usually not be until he retires, at which time the stock held by the ESOP and sold to fund his retirement will, to the extent that it is overvalued, be sold at a loss—in which event the original tax

benefit will never be recaptured. (The tax dimensions of ESOPs are lucidly discussed in Alan Hyde & Craig Harnett Livingston, "Employee Takeovers," 41 *Rutgers L.Rev.* 1131, 1141–44 (1989).) So the Internal Revenue Service has an interest in the valuation of the shares transferred to an ESOP, as do the ESOP's beneficiaries, at least formally, because an ESOP is not authorized to acquire the employer's securities for more than "adequate consideration." 29 U.S.C. § 1108(e)(1); see also 29 U.S.C. § 1104(a)(1)(A).

So State Street Bank, as the ERISA fiduciary, had to fix a price for the preferred stock that would make the ESOP's investment in that stock appear to be a reasonable investment of plan assets. The price had therefore to be based on market value. There was no market in the new preferred stock itself, but there was of course a market in United's common stock. Because the new preferred stock carried a right to a 7 percent dividend and the common stock no right to a dividend, State Street fixed a price for the preferred stock, $121, that was derived from but somewhat higher than the current market price of United's common stock. The bank could hardly have done otherwise. Yet the plaintiffs argue that this price was too low, because if you divide the value of the wage and benefits concessions that their unions made by the number of shares, the result, $210, is far in excess of the price that the bank fixed for the stock. They conclude that they paid $210 per share for stock worth only $121, and they say that as their fiduciary State Street should have refused to implement so one-sided a bargain.

They do not mean that the bank should have fixed the price of the preferred stock at $210. That would have done nothing for them; they would have been getting the same amount of stock. Their argument is that because the deal did not give them an amount of stock commensurate with their wage and benefits give ups, the bank should have killed the deal. It should have told United and the unions that if they wanted to transfer control and majority ownership to the ESOP they would have to renegotiate the terms—reduce the wage and benefits concessions, increase the amount of stock transferred, or both.

If the wages and benefits of United's employees were assets of the retirement plan, then the trustee could indeed be faulted for exchanging them for securities worth less. But they were not. The plan had no assets. It received all its assets from United. The reason for requiring the trustee to price the shares was that a *normal* retirement plan has money and uses it to buy shares, and it is important to the participants in that sort of plan that the value of the shares bought be commensurate with the outlay necessary to buy them, and that ERISA mysteriously (and the IRS less mysteriously) requires the fiduciary of an ESOP to value an employer's gift of the employer's securities as if it were a real sale. The ESOP did not acquire preferred stock of United with the wages or fringe benefits of United's employees. It got them for nothing, as part of a larger deal in which the United-gifted ESOP along with other employer concessions were consideration for the employees' wage and benefits concessions. Obviously the "gift" to the ESOP was not an eleemosynary gesture; it was intimately related to the employees' concessions; but it was not funded by those concessions.

Because the wages and benefits of the employees were never assets of the ESOP, the give ups did not deplete those assets. On the contrary: the larger the give ups, the more profitable United would be; the more profitable it would be, the more its stock would be worth; the more its stock was worth, the greater would be the ESOP's assets. State Street's fiduciary obligation to the plan participants thus required it to *disregard* the give ups. Of course, the participants and the employees are, at first anyway, the same people; the ESOP shares go into one pocket, the give ups come out of another. But an ERISA trustee cannot transfer plan assets, directly or indirectly (as through loans to the employer), to the employer of its participants, 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A)(i), 1106(a)(1); *Leigh v. Engle,* 727 F.2d 113, 124–26 (7th Cir.1984), even though this might benefit the employees. Nor—and more to the point of this case—can

it transfer plan assets to the employees directly. See 29 U.S.C. §§ 1056(d)(1) (anti-alienation rule), 1104(a)(1)(A)(i) (exclusive benefit rule); *Donovan v. Mazzola*, 716 F.2d 1226, 1232–33 (9th Cir.1983); *Donovan v. Bierwirth*, 680 F.2d 263, 265, 271 (2d Cir. 1982) (Friendly, J.); Daniel Fischel & John H. Langbein, "ERISA's Fundamental Contradiction: The Exclusive Benefit Rule," 55 *U. Chi. L.Rev.* 1105, 1139–40 (1988). The trustee's sole duty is to the participants as participants. The practical reason is that as employees retire, the participants come to consist of both active and retired employees; and to favor the former would violate the trustee's duty to the latter. See *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984). It would be picking and choosing among beneficiaries, in violation of the traditional duty imposed by trust law of impartiality among beneficiaries. *Restatement of Trusts (Second)* § 183 (1959). State Street thus could not consider the cost of the deal that established the ESOP to the employees for whom the ESOP was created. The give ups, we repeat, did not reduce the plan's assets—they increased them—and thus did not hurt, but in fact helped, the employees qua plan participants.

We have explained why the suit must fail but we add that it would be fantastic to suppose that the parties to the deal had intended State Street to determine the deal's net value to the employees. That value was a function not only of the wage and benefit give ups, which are readily monetizable, but also of the enhanced job security brought about by a reduction in United's labor costs. The plaintiffs might not have their jobs, or equally good jobs, today if United's labor costs had remained what they were. Valuing this benefit is difficult, perhaps impossible. In putting the deal together the unions made a rough, perhaps largely intuitive, judgment of the value to their members of giving up some of their wages and benefits in exchange for enhanced job security. The ESOP shares were thus only part of the consideration flowing to the employees—indeed, many unions agree to give ups in order to preserve jobs without obtaining any increased retirement benefits. For all we know—more to the point, for all State Street Bank could know—the combination of the ESOP shares and enhanced job security was worth more than $210 per share of preferred stock to United's employees.

There is no need for us to scrutinize the terms of the rather poorly drafted agreement between the unions and United defining the role of State Street bank. If as the plaintiffs implausibly argue the agreement required State Street to appraise the give ups and if they were worth more than the preferred stock to blow the whistle on the deal, then the agreement violated ERISA, which forbade the bank, as the trustee of the ESOP, to consider the possible adverse effects of the deal not on the plan, but on United's employees.

No more has to be said to decide the appeal, but we shall touch quickly on a few more wrinkles because of the emphasis they received in the briefs:

1. The deal establishing the ESOP and vesting fiduciary responsibilities in State Street Bank was formalized in collective bargaining agreements between the unions and United. It is hardly likely that the unions would delegate to a bank the power to nullify a collective bargaining agreement, even if the unions' bylaws authorized this—we have not been informed whether they did—and labor law permitted it, an issue on which we do not opine (and do not find any authority).

2. It is equally unlikely that a bank, whose role in the transaction was of a technical, almost a custodial, character, would have undertaken obligations that could expose it to more than a billion dollars in liability if it guessed wrong about the net value of the give ups.

■ 3. All else aside, the dissolution of an ERISA plan, the act that the plaintiffs say was incumbent on State Street, is not itself a fiduciary act, *Heath v. Varity Corp.*, 71 F.3d 256, 258 (7th Cir.1995); *Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994); nor is collective bargaining to determine the terms of such a plan, *United Independent Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1268 (7th Cir. 1985); *Lea v. Republic Airlines, Inc.*, 903 F.2d 624, 630–31 (9th Cir.1990), nor, we sup-

pose, the determination of those terms by the union's delegate. This case could not be based on a violation of ERISA even if the parties to the collective bargaining agreement had tried to grant State Street the power to nix the deal—which they could not have done, as we explained earlier, because of ERISA.

AFFIRMED.