180 F.3d 814
 FIRST NATIONAL BANK OF CHICAGO, as Trustee of Institutional
Real Estate Fund F, Plaintiff-Appellee,
v.
A.M CASTLE & COMPANY EMPLOYEE TRUST and A.M. Castle &
Company Employees Profit Sharing Trust,
Defendants-Appellants.
 No. 98-3309.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 5, 1999.
Decided June 9, 1999.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 93 C 896--James B. Zagel, Judge.
 Before Posner, Chief Judge, and Easterbrook and Evans, Circuit Judges.
 Posner, Chief Judge.
 
 
 1
 Two affiliated employee benefit plans ("Castle" for short) appeal from the grant of summary judgment to the First National Bank of Chicago (now called "Bank One" as a result of recent merger) in a case that arises out of a dispute over the bank's administration of a real estate investment fund which the bank created and operated and in which Castle, the plaintiff, invested. The bank is conceded to be a fiduciary because it exercised discretion over the investments made by the fund-a typical common trust fund except holding real estate rather than securities, Board of Governors v. Investment Company Institute, 450 U.S. 46, 55, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981); First National Bank v. Comptroller of the Currency, 956 F.2d 1360, 1361-62 (7th Cir.1992)-and an ERISA fiduciary because the Castle plans are ERISA plans. 29 U.S.C. sec. 1002(21)(A); Johnson v. Georgia-Pacific Corp., 19 F.3d 1184, 1188 (7th Cir.1994); Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 18 (1st Cir.1998). But the principles applicable to the dispute are those of trust investment law in general rather than anything special to either the regulation of national banks or to ERISA.
 
 
 2
 Institutional Real Estate Fund F was created in 1972. It had 45 participants, and was an openended fund, meaning that the investor could withdraw his investment. The trust instrument authorized the fund to pay out a withdrawing investor either "in cash or in kind or partly in cash and partly in kind," and to take up to a year to do so. A similar provision was found in the regulation of the Office of the Comptroller of the Currency governing the fiduciary duties of national banks (such as First National Bank of Chicago), 12 C.F.R. sec.sec. 9.18(b)(4), (6) (1963)--except that where the trust instrument says "in cash or in kind," the regulation said "in cash or ratably in kind," which arguably forbade the bank to pay out a withdrawing investor by giving the investor an entire property or properties ("in kind") as distinct from a proportional interest in the fund's entire portfolio of properties (a possible interpretation of "ratably in kind"). The regulation has been superseded, as we shall see, but neither the original nor the replacement regulation controls the issues in this appeal.
 
 
 3
 In November 1989, a time when the commercial real estate market in the United States was severely depressed, Castle notified the bank that it had decided to withdraw its investment in Fund F. The total appraised valuation of the fund was then $530 million and Castle's share was valued at $2.8 million. Castle was not the only investor who wanted out; $135 million in withdrawal demands were pending when Castle put in its demand. The bank was reluctant to sell, or to borrow against, enough properties in the fund's portfolio to pay all the demands in cash, or, in lieu of a cash distribution, to distribute fractional shares in the portfolio. In December 1989, the month after Castle's demand, the bank proposed to the investors a modification of the trust instrument that would, notwithstanding the Comptroller's regulation, expressly permit the distribution of whole properties to withdrawing investors. Several of these investors, including Castle, refused to consent to the modification. The bank sued them in federal district court, seeking a declaration that the proposed modification would not violate the bank's fiduciary duties. Castle successfully moved to dismiss the suit on the ground that the bank was seeking an advisory opinion and therefore the suit did not engage the court's jurisdiction.
 
 
 4
 The bank had to navigate not only the trust instrument but also the regulation, which the Comptroller indeed interpreted to forbid wholeproperty distributions, so that if the bank didn't want to cash out withdrawing investors it would have to give them fractional interests in its entire portfolio of properties. The bank sought judicial review of the Comptroller's ruling disallowing the whole-property method of distribution. We upheld the ruling, First National Bank v. Comptroller of the Currency, supra, pointing out among other things that if whole-property distributions were allowed, an investor who had invested in a real estate common trust fund in order to obtain a diversified interest in the real estate market would find itself owning in lieu of such an interest a distinctly undiversified asset--a building. 956 F.2d at 1366; cf. Hamilton v. Nielsen, 678 F.2d 709, 712-13 (7th Cir.1982). The bank filed a petition for certiorari, which was denied in October of 1992; and the following January the bank finally bowed, and offered Castle and the other withdrawing investors who had refused to agree to the modification of the trust instrument packages of cash and fractional interests in the fund's portfolio. These investors spurned the tender, precipitating the present litigation, which the bank instituted the following month (February 1993) to obtain a declaratory judgment that the investors had to accept fractional interests. The Comptroller later amended his regulation to give banks greater flexibility in the form of withdrawals, 12 C.F.R. sec. 9.18(5)(iv); "Fiduciary Activities of National Banks," 61 Fed.Reg. 68543, 68559-60 (Dec. 30, 1996), but the amendment came too late to affect this litigation.
 
 
 5
 The bank has now settled with all the defendants except Castle. It has also liquidated Fund F and given Castle its distribution in the form of cash, as Castle had sought all along. But Castle argues, in support of a counterclaim alleging a breach of fiduciary duty by the fund in refusing to cash it out within a year following its withdrawal demand of November 1989, that had it received and invested the cash back then, years earlier than it did receive it (oddly, the record is silent on the date of the distribution, but it may have been as late as 1998), it would be better off now than it is as a result of the cash distribution that it finally received.
 
 
 6
 The district court dismissed the counterclaim, thus terminating the litigation. The court's ground was that the bank had acted in good faith in seeking permission first from the Comptroller and then from the courts to make a whole-property distribution, a legal procedure that inevitably took more than a year. In fact it took almost three years, from December 1989, when the decision to modify the trust instrument was made, to October 1992, when the Supreme Court closed the door to whole-property distribution by denying certiorari and thus ending the bank's litigation with the Comptroller in the latter's favor.
 
 
 7
 The appeal challenges the dismissal of Castle's counterclaim; and we regret to say, given the age of this dispute, that we are unable to find a factual basis for that dismissal. The bank's fiduciary obligation, so far as bears on the parties' dispute, was to act prudently with reference to the demand by Castle and other investors for the withdrawal of their investments at a time when the real estate market was depressed. 29 U.S.C. sec. 1104(a)(1)(B); First National Bank v. Comptroller of the Currency, supra, 956 F.2d at 1368; Oster v. Barco of California Employees' Retirement Plan, 869 F.2d 1215, 1218-19 (9th Cir.1988); Restatement (Third) of Trusts: Prudent Investor Rule sec. 227 (1992); Restatement (Second) of Trusts sec. 174 (1959). The trust instrument gave the bank only one year to honor a request to withdraw. Had an emergency arisen that would have made the investors as a whole worse off by compliance with the one-year limitation--an emergency akin to a run on a bank--the bank would have had the right, and perhaps even the duty (though we need not decide that), as a fiduciary, to extend the deadline. Robertson v. Central Jersey Bank & Trust Co., 47 F.3d 1268, 1275 n. 6 (3d Cir.1995); Faulk v. Rosecrans, 264 P.2d 300, 303-04 (Okla.1953); 2A Austin Wakeman Scott & William Franklin Fratcher, The Law of Trusts sec. 167.1 (4th ed.1987); Restatement (Second) of Trusts, supra, sec. 167(2). This right, or duty, is implicit in the principle that a trustee or other fiduciary is obligated to treat its clients/beneficiaries impartially. Summers v. State Street Bank & Trust Co., 104 F.3d 105, 108 (7th Cir.1997); Fogelin v. Nordbloom, 402 Mass. 218, 521 N.E.2d 1007, 1011 (Mass.1988); Estate of Pew, 440 Pa.Super. 195, 655 A.2d 521, 542 (Pa.Super.1994); Northern Trust Co. v. Heuer, 202 Ill.App.3d 1066, 148 Ill.Dec. 364, 560 N.E.2d 961, 964 (Ill.App.1990), Restatement (Second) of Trusts, supra, sec. 183; 2A Scott & Fratcher, supra, sec. 183. But it would be a question of fact whether such an emergency existed, and if so whether the bank had acted prudently in response to it.
 
 
 8
 The fact that the market was depressed and many of the investors wanted out would not, without more, constitute an emergency warranting violation of the one-year deadline in the trust instrument, bearing in mind the importance to investors, codified in the deadline, of the liquidity of their investment. Properties are salable in a depressed market, only at a lower price than in a booming one; and an alternative to selling properties would be to borrow against them. Still, the market for the type of properties held by a particular real estate trust might be so thin, or its properties so heavily leveraged, that an effort to cash out a large fraction of the investors would leave the others-who might be as eager not to have the properties sold as the investors seeking withdrawal were eager for cash--so badly off that the bank might not be compelled, or perhaps even permitted, to comply with the one-year deadline. Duty might require it to seek an alternative mode of disposition to cashing out (by sale or borrowing), such as distributing whole properties. An investment fiduciary's obligations run, as we said, to the investors as a whole, which implies a need to balance conflicting interests or desires.
 
 
 9
 If the bank was genuinely and reasonably uncertain about whether considerations of prudence, or the Comptroller's regulation, justified or permitted noncompliance with the deadline, it could, to minimize its legal risks, seek administrative and judicial clearances. Mosser v. Darrow, 341 U.S. 267, 274, 71 S.Ct. 680, 95 L.Ed. 927 (1951); Robertson v. Central Jersey Bank & Trust Co., supra, 47 F.3d at 1275 n. 6; Restatement (Second) of Trusts, supra, sec. 201, comment b, and sec. 167; 2A Scott & Fratcher, supra, sec. 167. But the bank could not use the time necessary to obtain such clearances--such "instructions," as we say in trust law--to excuse compliance with the deadline unless investors' interests were on both sides of the issue of compliance. A fiduciary is not authorized to violate the terms of a trust merely to minimize legal risk to itself; it has to be acting in the interest of the beneficiaries. An emergency or other powerful reason to believe that paying off withdrawing investors would injure those who remained was a necessary condition of any delay in payment. Otherwise a trustee would obtain a license to disregard a deadline or other term or condition of the trust by seeking judicial advice. Selfhelp extensions, for no reason other than the trustee's desire to reduce risk to itself, are improper. The trustee can set fees that compensate itself for risk, but it can't declare ex post (when an investor wants to withdraw) that the risk is too great for the fee being charged.
 
 
 10
 We cannot find any evidence that any investor in Fund F would have been hurt by the bank's complying with the one-year deadline by paying cash or giving fractional interests to investors such as Castle that wanted to withdraw their investment, let alone the uncontroverted or incontrovertible evidence that would justify summary judgment in the bank's favor. There is no evidence that the bank could not either have sold a substantial number of the properties in the fund's portfolio at a realistic market price or have borrowed against the portfolio to obtain the cash necessary to pay out Castle and the others. True, if the latter route had been followed there would have been an interest expense and the more the fund borrowed the harder it would find it to meet subsequent withdrawal demands, at least by borrowing. But either the real estate market would bounce back, enabling future demands to be met by the sale of properties at attractive prices, or, if the market turned out to be indefinitely depressed, the fund would have to sell properties at depressed prices eventually; Castle and the other withdrawing investors, all of whom had an entitlement to withdraw within a year, could not be put off indefinitely.
 
 
 11
 The likeliest cause of the bank's reluctance to honor the terms of the trust instrument is that Fund F's portfolio was overvalued. The bank may have failed to revalue it downward in light of the currently depressed state of the real estate market. Such a failure might incite a "run" on the "bank" which would have forced the liquidation of the entire portfolio on disadvantageous terms. That is, suppose Castle's share of the fund would have been worth, had the fund's portfolio been correctly valued, only $1.4 million; then it would have a strong incentive to demand to be paid out at the artificially enhanced valuation of $2.8 million. The other investors would also want to withdraw as fast as possible, fearing a game of musical chairs in which the last investors to withdraw would find themselves with nothing. (If as in the example the portfolio was valued by the fund at twice its actual market value, then the fund would be worth nothing after half the investments had been withdrawn.) If, therefore, everyone wanted out at once, the bank would have to sell off all the properties in the fund within a year, possibly at distress prices, given the fact that real estate is less liquid than many other investments. It is true that the bank was required to appraise the portfolio quarterly, 12 C.F.R. sec. 9.18(b)(4) (1963) (under the current regulation, only annual appraisals are required), but it may have wanted to conceal bad news. Whether or not this was the reason for the bank's reluctance to pay Castle in accordance with the terms of the trust instrument, the bank has failed to show that considerations of law or prudence required it to violate the terms of the instrument.
 
 
 12
 The bank makes two further arguments. The first is that our prior opinion, dealing with the bank's challenge to the Comptroller's ruling, held that it would have been prudent for the bank to make a whole-property distribution and so is a compelling precedent for the district court's decision that the delay was reasonable. The second argument is that by successfully moving to dismiss the bank's first declaratory judgment action, Castle became the author of the very delay in the return of its investment of which it complains.
 
 
 13
 The only issue in our previous opinion was the validity of the Comptroller's ruling, which was that the bank could not make a whole-property distribution. Delay past the one-year deadline was not at issue. In a passage comparing distribution of fractional interests in a real estate common trust fund to distribution of whole properties, we pointed out, in refutation of the bank's claim that the latter form was so clearly superior to the former as to demonstrate the unreasonableness of the Comptroller's ruling, that each of the two noncash alternatives had both advantages and disadvantages, and "given a choice between comparable evils, neither could be pronounced imprudent by a court." 956 F.2d at 1368. But this was assuming that the bank was entitled to choose; it was not if going the whole-property distribution route would require a waiver that the bank could not justify of the one-year deadline on complying with withdrawal requests. That question was not before us; nor were any of the investors parties to that litigation.
 
 
 14
 As for Castle's seeking to get the bank's first declaratory judgment dismissed on jurisdictional grounds, we point out that a lawyer (and his client) cannot be sanctioned directly or indirectly for performing his duty as an officer of the court of apprising the court that it is acting beyond its jurisdiction; the lawyer has an ethical duty to do that. Richmond v. Chater, 94 F.3d 263, 267 (7th Cir.1996); Minority Police Officers Ass'n v. City of South Bend, 721 F.2d 197, 199 (7th Cir.1983); Aves by and through Aves v. Shah, 997 F.2d 762, 767 (10th Cir.1993). Castle's lawyer may have been wrong in the advice he gave the court on this question, since it is a traditional judicial office to give instructions to trustees who have substantial questions concerning their duties, and not one that Article III is sensibly interpreted as denying to federal courts, now that so much trust litigation comes into these courts under ERISA. See, e.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). But it is a tradition that evolved in state courts untroubled by Article III's limitation of federal judicial power to actual cases or controversies, and so it is arguable that unless there is an actual controversy between trustee and beneficiary, or the conditions for an interpleader are present, a federal court has no power to instruct the trustee on his duties. Harris Trust & Savings Bank v. E-II Holdings, Inc., 926 F.2d 636, 639-41 (7th Cir.1991). There was an actual controversy between trustee and beneficiary here, however, given that Castle had already made, and the bank had already refused, a demand for a cash distribution. Still we do not think that Castle's lawyer was unreasonable in making a jurisdictional argument that did, after all, convince an experienced federal district judge. Moreover, the suit was dismissed in January of 1991, more than a year after Castle's demand. Had the suit not been dismissed then, it would no doubt have been stayed until we decided the bank's case against the Comptroller and then would have resumed on a schedule similar to that of the present litigation. So if the lawyer did act improperly, no harm was done and the client should not be penalized.
 
 
 15
 The case has to be remanded for a determination of whether the bank acted prudently in suspending the one-year deadline for complying with requests for withdrawal and, if not, whether the result was to make Castle worse off than it would be had the bank complied. Since the dispute out of which the case arises is now ten years old and the litigation over it is has been extensive, we trust that we have furnished enough guidance in this opinion to enable the suit now to be settled.
 
 
 16
 Vacated and Remanded.