In re ENVIRODYNE INDUSTRIES, INC., Sandusky Plastics, Inc., Sandusky Plastics of Delaware, Inc., Viskase Corporation, Viskase Holding Corporation, Viskase Sales Corporation, Clear Shield National, Inc., Envirodyne Finance Company, Debtors.

Bankruptcy Nos. 93 B 310, 93 B 312 thru 93 B 316, 93 B 318 and 93 B 319.

United States Bankruptcy Court, N.D. Illinois, E.D.

Nov. 24, 1993.

See also, 150 B.R. 1008.

Allan S. Brilliant, Holleb and Coff, Chicago, IL, for debtors.

James E. Spiotto, Chapman and Cutler, Chicago, IL, for Official Creditors Committee.

Steven E. Greenbaum, Berlack, Israels & Liberman, New York City, for Unofficial Committee of 13.5% Noteholders.

T. William Opdyke, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, for Bank of America, as successor Indenture Trustee under the Indenture governing the Old 13.5% Notes.

### MEMORANDUM OPINION

JOHN D. SCHWARTZ, Chief Judge.

The matter before the court is the portion of the Objections of the Unofficial Committee of 13½% Noteholders (13½'s) and Bank Of America N.T. & S.T., As Indenture Trustee, ("Objectors"), to the Debtors' First Amended Joint Plan of Reorganization as Twice Modified ("Plan") as they pertain to the subordination provision contained in Section 15.02 paragraph three of the Indenture governing the 13.5% (originally 12.0%) Notes dated June 15, 1986 and due June 15, 1996. The Court has received and considered the Objections of the 13½'s and Bank of America, the Memorandum of Law in Support of the Objection of the 13½'s to the Debtors' First Amended Joint Plan of Reorganization as Twice Modified, the Debtors' Motion for a Hearing Regarding the Objections of the 13½'s and Bank of America Regarding the Provisions of the Debtors Plan Related to

The Subordination of the 13½% Notes, the Memorandum of Law of the Official Committee of Bondholders of Envirodyne Industries, Inc. Concerning the "X Clause" of the June 15, 1986 Envirodyne Indenture, the Response of State Street Bank and Trust Co., as Indenture Trustee in Behalf of the Holders of the 14% Senior Subordinated Notes Due 2001, to the Objection of the 13½'s to the Debtors' First Amended Joint Plan of Reorganization as Twice Modified, the Reply Brief of the 13½'s Regarding the 13.5% Noteholders' Entitlement to *Pari Passu* Treatment Under the Modified Cramdown Plan, the Reply Brief of Bank of America Regarding the Appropriate Interpretation of the "X" Clause, and permitted each party time to argue its or their positions. For the reasons set forth in open court and now more particularly in this memorandum, the Court overrules the Objectors' interpretation of the Indenture and adopts that of the Official Committee of Bondholders and the Debtor.

## FACTS AND BACKGROUND

The relevant facts are as follows: On January 7, 1993 Envirodyne Industries, Inc., a holding company with numerous subsidiaries, converted an involuntary petition for reorganization under Chapter 11, filed the previous day by certain holders of the 13.5% Notes, into a voluntary petition under Chapter 11.[1] The Debtors continue to operate their various businesses as the debtors in possession, pursuant to 11 U.S.C. §§ 1107(a) and 1108[2] of the Bankruptcy Code.

On January 22, 1993, an Official Bondholders Committee[3] was formed to represent the interests of the three tranches of unsecured debt. The first tranch, the Senior Discount Notes Due 1997 dated August 1, 1989, with State Street Bank as Trustee ("Senior Notes"), is not affected by this dispute as they received New Notes in satisfaction of their claim. The second tranch, the 14%

Senior Subordinated Debentures Due 2001 dated August 1, 1989, with Bankers Trust as Trustee ("14% Senior Debentures"), is indirectly affected by this dispute as they will receive New Common Stock under the Plan. These two tranches were issued to refinance the leveraged buyout (LBO) through which the current management obtained control of the company. The third tranch existed prior to the time of the LBO, having been issued on June 15, 1986 at an initial interest rate of 12%, increased to 13.5% subsequent to the LBO. The holders of the third tranch believe that they are entitled to a portion of the New Common Stock allocated to the second tranch. The Unofficial Committee of 13.5% Noteholders represents the holders of some of these Notes.

On June 2, 1993 the Debtors filed a Joint Plan of Reorganization and accompanying Disclosure Statement. On August 10, 1993, the Debtors filed the First Amended Joint Plan of Reorganization and accompanying Amended Disclosure Statement. On that same day this Court approved the Disclosure Statement as containing adequate information and authorized the distribution of the statement to all of the creditors and parties-in-interest. Finally, on October 12, 1993, the Debtors filed their First Amended Joint Plan of Reorganization as Twice Modified and accompanying Modified Disclosure Statement. Two days later this court approved the Plan and ordered it mailed to the creditors and parties-in-interest.

Each version of the Plan was premised on the assumption that the subordination provision contained in the Indenture for the 13.5% Notes ("Indenture")[4] required the payment of all Superior Indebtedness (the holders of the Senior Notes and the holders of the 14% Senior Debentures) ahead of the 13.5% Notes. The Debtors' First Amended Plan valued the 13½'s allowed claim at approximately $104 million. Under the Plan, the

1. In addition, voluntary petitions were filed for the several subsidiaries listed in the heading. All of the cases were consolidated for administrative purposes.

2. All Code references are to 11 U.S.C. § 101–1330 (1993) unless otherwise stated.

3. Although this committee is referred to as a Bondholders Committee, it is in fact a Noteholders Committee as the obligations are unsecured.

4. The June 15, 1986 Indenture Agreement between Envirodyne Industries, Inc. and Continental Illinois National Bank & Trust Co. of Chicago as Trustee.

13½'s were initially allocated $67 million of New Common Stock in the reorganized company in satisfaction of this claim.[5] However, pursuant to the subordination provision described below, the Debtor reclassified the common stock allocated to the 13½'s to the holders of Superior Indebtedness. Consequently, the 13½'s distribution under the original Plan was reduced to zero. As a result, the Objectors filed an objection to the Plan. The Debtors response, in the First Amended Plan as Twice Modified, was to allocate to the 13½'s a combination of New Common Stock and warrants worth approximately $19.1 million[6]. The 13½'s remained unsatisfied and therefore renewed their objection.

The dispute is whether the third paragraph of section 15.02 of the Indenture contains an exception to an exception which would allow the 13.5% Noteholders to retain or obtain New Common Stock under any plan that provided for the receipt of stock in lieu of debt, be it Superior Indebtedness[7] or otherwise. The provision states:

> In the event that any Note is declared to be due and payable pursuant to Article Six before the date specified therein as the fixed date on which the principal thereof is due and payable, or upon any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution or winding up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings, all principal of, and premium, if any, on, and interest due or to become due on, *all Superior Indebtedness shall first be paid in full before the Noteholders, or the Trustee, shall be entitled to retain any assets (other then shares of stock of the Company, as reorganized or readjusted or securities of the Company or any other corporation provided for by a*

*plan of reorganization or readjustment, the payment of which is subordinated, at least to the same extent as the Notes, to the payment of all Superior Indebtedness which may at the time be outstanding )* so paid or distributed in respect of the Notes (for principal, premium, if any, or interest); and upon such dissolution or winding up or liquidation or reorganization any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities *(other then shares of stock of the Company as reorganized and readjusted or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, the payment of which is subordinate, at least to the same extent as the Notes, to the payment of all Superior Indebtedness which may at the time be outstanding)* to which the Noteholders or the Trustee would be entitled, except for the provisions of this section 15.02, shall be paid by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, or by the Noteholders or the Trustee if received by them or it, directly to the holders of the Superior Indebtedness (pro rata on the basis of the respective amounts of Superior Indebtedness held by such holders, but subject to any subordination agreements to which such holders or their representative or representatives are subject), or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any of such Superior Indebtedness may have been issued, to the extent necessary to pay in full all Superior Indebtedness after giving effect to any concurrent payment or distribution to or for the holders of Superior Indebtedness, before any payment or distribution is made to the Noteholders or to the Trustee; and the holders of Superior Indebtedness are hereby authorized to

---

5. *See* Debtors' First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code at 8–9.

6. *See* Second Supplement to Debtors' First Amended Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code to Disclose

Modifications to Debtors' First Amended Joint Plan if Reorganization as Twice Modified at 15.

7. According to the definition of Superior Indebtedness in the Indenture agreement for the 13.5% Notes, the 13½'s claims are subordinate to the other two tranches of debt.

file an appropriate claim for and on behalf of the holders of the Notes if they or any of them do not file a proper claim or proof of claim in the form required in any such proceeding prior to 30 days before the expiration of the time to file such claim or claims. (emphasis added)

The Objectors assert that the underscored provision of section 15.02 provides an exception for distributions of common stock to the 13.5% Noteholders under a plan of reorganization. They read the above provision to state that the 13½'s "shall be entitled to retain" all "shares of stock of the Company" to which they otherwise "would be entitled" under a plan of reorganization. Objection of the Unofficial Committee of 13.5% Noteholders to the Debtors' First Amended Plan of Reorganization at 13, *In re Envirodyne Industries, Inc.*, 93 B 319 (Nov.1993). The Objectors maintain that this clause forbids the Debtors from giving effect to an otherwise valid subordination provision and prevents the "reallocation" of common stock distributions away from the 13½'s.[8] Objection of the Unofficial Committee of 13.5% Noteholders to the Debtors' First Amended Plan of Reorganization as Twice Modified at 16, *In re Envirodyne Industries, Inc.*, 93 B 319 (Nov.1993). Therefore, according to the 13½'s, any distribution of common stock under a plan of reorganization is not subordinated to the claims of the holders of Superior Indebtedness.

On the other hand, the Debtors insist that the language, intent, and purpose of the subordination provision would be defeated if such a reading of the provision is adopted. They argue that the 13½'s can only retain stock or securities to the extent that they remain subordinate to full payment of Superior Indebtedness. Under the Plan, the claims of the holders of Superior Indebtedness have not been fully satisfied yet the 13½'s, as subordinated indebtedness, are receiving a distribution, albeit a small one, when they are not entitled to any distribution.

## DISCUSSION

■ All of the parties agree that the subordination provision is unambiguous and the interpretation of this clause is a question of law that should be resolved by looking at the four corners of the document. In addition, the interpretation of the subordination clause is not affected by the bankruptcy proceedings. 11 U.S.C. § 510(a) (1993).

■ The parties also agree that New York law should be used to interpret the document.[9] Where a contract is clear and specific, as both parties assert, then the words of the contract must be given their plain, ordinary and usual meaning. *Jamie Securities Co. v. The Limited, Inc.*, 880 F.2d 1572, 1576 (2d Cir.1989); *Broad v. Rockwell Int'l. Corp.*, 642 F.2d 929, 948 (5th Cir.) (applying New York law), *cert. denied* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). When interpreting a contract, courts shall read the contract as a whole and consider all parts as part of the whole and not give undue force to certain words or phrases that would distort or confuse the primary and dominant purpose of the contract. *Empire Properties Corp. v. Manufacturers Trust Co.*, 288 N.Y. 242, 248, 43 N.E.2d 25, 28 (1942). Finally, courts should construe an indenture as a whole to carry out the plain purpose and object of the indenture and not limit itself to

---

**8.** In the Introduction to the Debtors' Disclose Statement pursuant to Section 1125 of the Bankruptcy Code, the Debtor uses a chart to show the distribution of value before and after giving effect to the various subordination clauses. The Objectors, before giving effect to the subordination provision in the Indenture, would have recovered 63.9% of their claim. In the First Amended Plan, after giving effect to the subordination provision, the Objectors did not receive any distribution. It is this "reallocation" that the Objectors are so vigorously opposed to. In an attempt to appease the Objectors, in the First Amended Plan as Twice Modified, the Objectors have the opportunity to receive a distribution worth approximately 10% of their claim. The Objectors remain disgruntled and insist they are entitled to recover on a pro rata basis with the 14% Senior Debenture holders. Under the Objectors interpretation, the number of shares allocated to the 14% Senior Debentures and the number of shares allocated to the 13.5% Notes should be totaled and then allocated pro rata so that the cash amount of allowed debt for each 13.5% Note and each 14% Debenture would be treated alike.

**9.** *See* the Indenture Agreement § 14.04 at 73.

literal interpretations. *Id.* 288 N.Y. at 448–9, 43 N.E.2d at 28.

■ The clause that the 13½'s rely upon to support their claim to shares of stock of Envirodyne is commonly referred to as an "X Clause". While agreeing that the "X" clause in this Indenture is unambiguous and should be interpreted solely by looking at the four corners of the document, the Objectors maintain that the Debtors use of law reviews and the American Bar Foundation, *Commentaries on Model Indenture Provisions* 559 (1970) ("Commentaries") to interpret the "X" clause constitutes extrinsic evidence and should be ignored by the court. They argue that the use of such articles is an attempt by the Debtors to introduce evidence of intent, trade custom, and industry practice to interpret an unambiguous document.

However, the Debtors' use of the Commentaries and law review articles is in the form of corroborative evidence, not extrinsic evidence, as the use of the articles is limited to interpreting the nature of "X" clauses in general not in explaining this particular clause. The Commentaries have been consistently relied on when interpreting bond indentures. *See, e.g., Harris Trust and Savings Bank v. E–II Holdings, Inc.,* 926 F.2d 636, 644 (7th Cir.), *cert. denied* —— U.S. ——, 112 S.Ct. 192, 116 L.Ed.2d 152 (1991) (Commentaries relied on to interpret the scope of the indenture trustees power to investigate the issuer's books and records); *Elliott Associates v. J. Henry Schroder Bank and Trust Co.,* 838 F.2d 66, 71 (2d Cir.1988) (Commentaries relied on to interpret the notice provision in the indenture). The Debtors' interpretation of the "X" clause is supported solely by the language of the clause without reference to the Commentaries or law review articles.

■ Returning to the "X" clause, the objective of such a clause in a subordination provision is best explained as follows:

> In the event of any marshalling and distribution of assets of the borrower, whether voluntary or involuntary, whether because of the insolvency of the borrower [or a plan of reorganization] or for any other reason, the *holders of the senior debt receive pay-ment in full of all principal and interest on the senior debt before the holders of the subordinated debt receive any payment of principal or interest on the subordinated debt.* (emphasis added)

Edward Everett, *Analysis of Particular Subordination Provisions,* 23 Bus.Law. 41, 44 (1967). The "X" clause is an exception to subordination that provides a method for junior debtholders to retain existing shares of stock or new shares of stock in a reorganized company allocated to them pursuant to a plan of reorganization in the event the senior indebtedness is paid in full or receives stock or securities that is senior to that received by the junior noteholders. *Id.* Accordingly, the Indenture for the 13.5% Notes allows junior indebtedness to retain stock or securities of the reorganized company *provided such payment is subordinated at least to the same extent* as the Notes to the payment of all Superior Indebtedness. *Indenture* at § 15.-02.

■ The "X" clause in this Indenture contains the typical language used to insure that holders of senior indebtedness are paid in full before the junior indebtedness in the event of a reorganization. *See Commentaries* at 570. (The Commentaries provide examples of typical "X" clauses). The Commentaries explain:

> In the case of a plan of reorganization which, for example, provides that mortgage bonds, preferred stock or similar higher class security be issued to the holders of senior debt, and common stock be issued to the debenture holders. The theory is that this kind of distribution gives practical effect to the subordination *and therefore turnover is not required.* (emphasis added)

*Id.* Therefore, "X" clauses allows junior indebtedness to retain subordinate stock or securities in a reorganization when the senior indebtedness receives a higher class of security, such as preferred stock. However, in the instant case, Envirodyne proposes to distribute common stock to all indebtedness. Accordingly, under the plain language of the subordination provision, the 13½'s are not entitled to any distribution until the holders of Senior Indebtedness are paid in full.

■ Nevertheless, the Objectors assert that the "X" clause entitles them to *pari passu* treatment with regard to any common stock distributed under a plan of reorganization. Through the use of conclusory and argumentative language, the Objectors attempt to obliterate the meaning of the "X" clause in the subordination clause by creating an exception to the exception. As discussed above, an "X" clause is an exception to subordination that allows subordinated debtholders to retain certain interests in a reorganized company to the extent that such interests are and remain subordinate. The Objectors maintain that there is an exception within this exception that allows them to retain shares of stock of reorganized Envirodyne regardless of whether they are subordinate.

The Objectors read the language of the "X" clause to allow the 13½'s to "retain [certain] assets ... (i) shares of stock of Envirodyne as reorganized or adjusted, *or* (ii) subordinated securities." Reply Brief of the Unofficial Committee of 13.5% Noteholders regarding the 13.5% Noteholders' entitlement to Pari Passu Treatment Under the Modified Cramdown Plan at 6, *In re Envirodyne Industries, Inc.,* 93 B 319 (Nov.1993). They perceive the "X" clause to allow the 13½'s to retain all shares of stock distributed under a plan of reorganization. For example, suppose under a plan of reorganization, stocks A, B, C, & D are distributed to all Noteholders. Stocks A, B, and C are distributed to holders of superior indebtedness and Stock D is distributed to the junior indebtedness. Under the plan, the holders of hypothetical stock D would not receive a dime until stocks A, B, & C had been redeemed. According to the 13½'s, this distribution would violate the provisions of the "X" clause. Under the Indenture, if the Envirodyne plan of reorganization distributes any

stock to any debt holder, then the 13½'s are entitled to such stock on a *pari passu* basis, without regard to any existing subordination agreements.

The 13½'s argue that any other reading of the provision would ignore the plain and ordinary meaning of the word "or" in the "X" clause and would in effect render the whole clause meaningless. The clause states that the 13½'s shall receive "shares of stock of the Company as reorganized or readjusted or securities of the Company ... provided for by a plan of reorganization or readjustment, the payment of which is subordinated ..." *Indenture* at § 15.02. They contend that the word "or" is used in the disjunctive to separate two mutually exclusive alternatives. Reply Brief of the Unofficial Committee of 13½% Noteholders Regarding the 13½% Noteholders' Entitlement to *Pari Passu* Treatment Under the Modified Cramdown Plan at 7, *In re Envirodyne Industries, Inc.,* 93 B 319 (Nov.1993). As a result, only the payment of securities are subordinated and the payment portion of the clause does not modify the phrase "shares of stock".

■ The fallacy of the Objectors' argument is that they fail to read the "X" clause as a whole and that their interpretation ignores the intent and plain meaning of a subordination agreement. When read as a whole, it is clear that the phrase "payment of which is subordinated" ("payment clause") in the "X" clause modifies both "shares of stock" and "securities." The "X" clause contains a comma before the restrictive adjectival phrase "the payment of which is subordinated".[10] This grammar strongly suggests that the phrase was designed to apply to both preceding subjects—"shares of stock" as well as "securities" and not just securities.[11]

---

10. *See* Memorandum of Law of the Official Committee of Bondholders of Envirodyne Industries, Inc. Concerning the "X Clause" of the June 15, 1986 Envirodyne Indenture at 11–12, *In re Envirodyne Industries Inc.,* 93 B 319 (Nov.1993). When an adjectival phrase is essential to the meaning of the sentence, it is considered "restrictive." *Chicago Manual of Style* § 5.36 (13th ed. 1982). *Id.* The Official Committee further explains that the phrase "payment of which is subordinated" is essential to the meaning of the

sentence. Rather then merely describing some general characteristic of "shares of stock" or "security," it restricts the kind of securities referred to in the provision to subordinated ones. *Id.*

11. *See* Memorandum of Law of the Official Committee of Bondholders of Envirodyne Industries, Inc. at 12.

The payment clause explicitly subordinates the payment of both stock and securities to the payment of Superior Indebtedness and not stock or securities as the Objectors' suggest. Therefore, the exception within the exception that the Objectors create does not exist. The 13½'s may retain shares of stock or securities in reorganized Envirodyne only to the extent that they are subordinate to the Superior Indebtedness.

■ The Objectors also argue that only "securities" can be subordinated to a right of "payment" because common stock, by its nature is subordinate to all debt and had no right of payment. Reply Brief of Bank of America, N.T. & S.A., as Indenture Trustee, Regarding the Appropriate Interpretation of the "X" Clause at 5, *In re Envirodyne Industries, Inc.*, 93 B 319 (Nov.1993). In this instance, the Objectors confuse the term "right to payment" as related to ordinary common stock (for example, common shareholders have no inherent right to a return of their investment) with the term "payment under the plan". Using the later phrase, the "X" clause is consistent in insuring that in a reorganization, the holders of Superior Indebtedness receive payment in full, regardless of the form of consideration, before the 13½'s are paid any consideration.

■ The Debtors' interpretation is bolstered by considering the plain meaning and intent of subordination agreements. The very purpose of subordination clauses is to allow holders of senior indebtedness to recover if the debtor cannot meet its obligations. In other words, in the case of a bankruptcy or a reorganization, the senior debt holders bargained to insure that they would recover on their claim before any junior debt holder could recover on their claim. The Objectors interpretation of the "X" clause, using the language of the Objectors, defies explanation and logic. A senior creditor simply would not agree to a subordination agreement in which its priority depended on the form of consideration chosen by the debtor. The Objectors argument must be rejected in order to effectuate the plain language and the intent of the subordination provision.

The subordination provision was part of the bargain by which the 13½'s advanced funds to Envirodyne. The 13½'s should not be able to escape this bargain because the holders of Superior Indebtedness are being paid in stock rather then cash or notes. The crater the Objectors' interpretation creates in the "X" clause is contrary to both the language and plain meaning of both the clause itself and of subordination clauses in general. Possible explanations as to why the "X" clause was poorly drafted range from the clause being on a computer disk and not carefully reviewed to the drafter's fourth grade grammar teacher being less than competent. Nevertheless, as the Court observed, the proceedings related to the payment of the Senior Indebtedness have been going on for the last 18 months and it was only in the last 2½ months that this creative and unique interpretation of the "X" clause was concocted. The Debtors' position was accepted upon the initial sale of the bonds through the first Disclosure Statement. In addition, the prospectus issued with the Indenture did not disclose that the Indenture contained a unique subordination provision limiting the holders of Superior Indebtedness right to recover in the case of a reorganization. It would be a disservice to the whole of the subordination provision to give the "X" clause in the Indenture the limitation the Objectors have read into it.

Although the "X" clause in the Indenture was not artfully drafted, the only interpretation of the clause within this Indenture which makes sense is to limit the 13½'s right to retain shares of stock or securities only after all holders of Senior Indebtedness have either been paid in full or received superior stock or securities.

### CONCLUSION

For the reasons stated above, the Court overrules the objections of the Unofficial Committee and Bank of America as they relate to the "X" clause in the 13.5% Indenture Agreement.

### ORDER No. 153

For the reasons set forth in the Memorandum Opinion entered of even date, the Court overrules the objections of the Unofficial

Committee of 13½% Noteholders and Bank of America N.T. & S.T., As Indenture Trustee (13.5% Notes) to the Debtors' First Amended Joint Plan of Reorganization as Twice Modified as such objections pertain to the subordination provision contained in Section 15.02 paragraph three of the Indenture Agreement governing the 13.5% (originally 12.0%) Subordinated Notes dated June 15, 1986.