In re DURA AUTOMOTIVE
SYSTEMS, INC., et. al.,
Debtors.

Thomas A. and Pattiann
Kurak, Plaintiffs,

v.

Dura Automotive Systems, Inc.,
et al., Defendants.

Bank of New York Trust Co., N.A.,
Intervening Defendant.

Bankruptcy No. 06–11202–KJC.
Adversary No. 07–51715–KJC.

United States Bankruptcy Court,
D. Delaware.

Dec. 7, 2007.

Tobey M. Daluz, Ballard Spahr Andrews & Ingersoll LLP, Wilmington, DE, for Plaintiffs.

Daniel J. DeFranceschi, Jason M. Madron, Marcos Alexis Ramos, Richards, Layton & Finger, P.A., Wilmington, DE, for Defendants.

Brian P. Guiney, Terence K. McLaughlin, Tonny K. Ho, Willkie Farr & Gallagher LLP, New York, NY, Kathryn D. Sallie, The Bayard Firm, Wilmington, DE, for Intervening Defendant.

### MEMORANDUM[1]

KEVIN J. CAREY, Bankruptcy Judge.

On October 30, 2006 (the "Petition Date"), Dura Automotive Systems, Inc. and related entities (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

The Debtors filed a proposed plan of reorganization (as amended, the "Plan") and corresponding disclosure statement (as amended, the "Disclosure Statement") on August 22, 2007. Revised versions of the Plan and Disclosure Statement were filed on September 28, 2007 and October 4, 2007. The Disclosure Statement was approved by the Court on October 4, 2007. The deadline for filing objections to the Plan was November 5, 2007 and the deadline for creditors to vote whether to accept or reject the Plan was November 15, 2007. Hearing on confirmation of the Plan is now scheduled for December 11, 2007.

Thomas A. and Pattiann Kurak (the "Plaintiffs") assert that they are beneficial holders of $81.5 million of certain subordinated notes issued by Debtor Dura Operating Corp. ("Dura OpCo") pursuant to the Subordinated Note Indenture (described in more detail below), who argue that the Debtors' Plan improperly excludes them from all distributions and recovery.[2] On September 19, 2007, the Plaintiffs filed this adversary proceeding against the Debtors, seeking a declaratory judgment that the Debtors' Plan violates applicable law by failing to provide for a distribution to Plaintiffs of New Common Stock (as defined below) and by failing to allow the Plaintiffs to participate in the Rights Offering (as defined below). *See* Complaint at p. 11. The Complaint also seeks a declaratory judgment that *any* plan proposed by the Debtors that distributes stock to general unsecured creditors must include a *pro rata* distribution that is received and retained by the Plaintiffs. *Id.*

By order dated October 15, 2007, the Bank of New York Trust Company, N.A. ("BNY" or the "Senior Notes Trustee") was authorized to intervene as a defendant in this adversary proceeding.

Currently before this Court are the following motions:

1. Motion by The Bank of New York Trust Company, N.A. to dismiss Adversary Proceeding, or, in the Alter-

---

1. This Memorandum constitutes the findings of fact and conclusions of law required by Fed. R. Bankr.P. 7052. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and § 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and § 157(b)(2)(A), (L) and (O).

2. I do not consider as relevant, in these circumstances, that the Plaintiffs purchased their subordinated notes at a substantial discount to par. *See* Supplemental 2019 Statement filed by Plaintiffs' counsel (main case docket no. 2203).

native, for Summary Judgment (the "BNY Motion") (docket no. 14)

2. Defendants–Debtors' Motion for Summary Judgment (docket no. 19); and

3. Plaintiffs' Motion for Summary Judgment (docket no. 24)

(collectively, the "Motions"). The Plaintiffs filed a response in opposition to the BNY Motion and the Debtors' Motion for Summary Judgment (docket no. 37). BNY and the Debtors' filed responses in opposition to the Plaintiff's Motion for Summary Judgment (docket nos. 34 and 35). Each party also filed a reply brief in support of its own motion (docket nos. 42, 45, and 47). Oral argument on the Motions was held on December 3, 2007.

In the BNY Motion, BNY argues that the Plaintiffs lacked the right to commence the adversary proceeding because they failed to follow procedural requirements set forth in the Subordinated Note Indenture. For the reasons set forth below, BNY's request for dismissal of the complaint will be denied.

The issue in the competing motions for summary judgment is whether a provision in the Subordinated Notes Indenture (known as the "X–Clause") and applicable provisions of the Bankruptcy Code entitle the Plaintiffs (and other subordinated noteholders) to receive and retain a *pro rata* distribution of stock, and the right to acquire stock, which the Plan offers to other unsecured creditors. For the reasons set forth below, I conclude that the Plaintiffs' reading of the X–Clause is inconsistent with the broader context of the Subordinated Notes Indenture. I agree with the Court's analysis in *In re Envirodyne Indus., Inc.*, 29 F.3d 301 (7th Cir. 1994), and related case law. Accordingly, and for the reasons set forth herein, BNY's and the Debtors' motions for summary judgment will be granted and the Plaintiffs' motion for summary judgment will be denied.

## UNDISPUTED FACTS

From the parties' respective submissions, I discern the following undisputed facts, upon which I rely in my analysis of the Motions.

### A. *The Indentures.*

In April 1999, Series A and Series B of the 9% Notes, denominated $300 million (U.S.) and $100 million, respectively, were issued pursuant to two indentures, each dated as of April 22, 1999 (as amended or supplemented, the "April 1999 Indentures"), among Dura OpCo, as issuer, U.S. Bank Trust National Association ("US Bank"), as indenture trustee, and certain of the Defendants listed on the signature pages thereto as guarantors (the "Guarantors"). Subsequently, Dura OpCo issued an additional $158.5 million in 9% Notes, Series C and D, pursuant to that certain indenture, dated as of June 22, 2001 (as amended or supplemented, the "June 2001 Indenture" and, together with the April 1999 Indentures, the "Subordinated Note Indenture"), among Dura OpCo, as issuer, U.S. Bank, as indenture trustee, and the Guarantors, as guarantors. The holders of notes issued under the Subordinated Note Indenture are known herein as the "Subordinated Noteholders" or the "9% Noteholders."

In April of 2002, Dura OpCo issued the 8 5/8% Senior Notes (the "Senior Notes") in the aggregate principal amount of $400 million, pursuant to that certain indenture dated as of April 18, 2002 (as amended or supplemented, the "Senior Notes Indenture") among Dura Op Co, as issuer, BNY, as indenture trustee, and certain Defendants listed on the signature pages thereto as guarantors.

Article 10 of the Subordinated Note Indenture is entitled "Subordination" and contains the following provision:

Section 10.01 Agreement to Subordinate.

The Company agrees, and each Holder by accepting a Note agrees, that the Indebtedness evidenced by the Notes is subordinated in right of payment, to the extent and in the manner provided in this Article 10, to the prior payment in full of all Senior Debt of the Company, including Senior Debt incurred after the date of this Indenture, and that the subordination is for the benefit of the holders of Senior Debt.

See Subordinated Notes Indenture at § 10.01. The term "Company" is defined in the Subordinated Notes Indenture as "Dura Operating Corp., and any and all successors thereto." See Subordinated Notes Indenture, § 1.01. The Subordinated Note Indenture also provides a specific provision addressing the subordination in the event of a chapter 11:

Section 10.02. Liquidation; Dissolution; Bankruptcy.

Upon any distribution to creditors of the Company in a liquidation or dissolution of the Company, in a bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to the Company or its property, in an assignment for the benefit of creditors or in any marshalling of the Company's assets and liabilities:

(i) holders of Senior Debt shall be entitled to receive payment in full of all Obligations due in respect of such Senior Debt (including interest after the commencement of any such proceeding at the rate specified in the applicable Senior Debt) before Holders of the Notes shall be entitled to receive any payment with respect to the Notes (*except that Holders may receive (i) Permitted Junior Securities* and (ii) payments and other distributions made from any defeasance trust created pursuant to Section 8.01 hereof); and

(ii) until all Obligations with respect to Senior Debt (as provided in subsection (i) above) are paid in full, any distribution to which Holders would be entitled but for this Article 10 shall be made to the holders of Senior Debt (*except that Holders of Notes may receive (i) Permitted Junior Securities* and (ii) payments and other distributions made from any defeasance trust created pursuant to Section 8.01 hereof), as their interests may appear.

See Subordinated Notes Indenture, § 10.03 (adding emphasis to the language at issue, known as the "X–Clause"). The term "Permitted Junior Securities" is defined in Section 1.01 as follows and is reproduced here precisely as it appears in the Subordinated Notes Indenture:

"*Permitted Junior Securities* " means:

(1) Equity Interests in the Company, DASI or any Guarantor; or

(2) debt securities that are subordinated to all Senior Debt and any debt securities issued in exchange for Senior Debt to substantially the same extent as, or to a greater extent than, the Notes and the Guaranties are subordinated to Senior Debt under this Indenture.

See Subordinated Notes Indenture, § 1.01.

## B. *The Plan.*

The Debtors' prepetition non-current debt structure is approximately $1.3 billion and comprised of: (a) credit facilities secured by first and second liens providing for aggregate borrowings of $325 million; (b) the Senior Notes, in principal face amount of $400 million; (c) the Subordi-

nated Notes, in principal face amount of approximately $536.6 million (using the exchange rate applicable on the Petition Date for those Subordinated Notes denominated in Euros), and (d) certain convertible subordinated debentures, in principal face amount of $55.2 million (the "Convertible Notes"). (*See* Disclosure Statement at 5–8).

The Plan contemplates a rights offering ("Rights Offering") of between $140 million and $160 million in new cash investments in exchange for between 39.3% and 42.6% of the common stock of the reorganized company (the "New Common Stock"), with the balance of the New Common Stock being distributed to holders of the Senior Notes and certain large trade creditors. (*See* Disclosure Statement at xi). Based on the valuations set forth in the Disclosure Statement, the Plan provides for holders of Senior Notes and other unsecured claimants to receive substantially less than full recovery on their claims.[3] (*Id.* at xiii).

The Plan provides the following classification and treatment of the Debtors' unsecured notes:

*Class 3—Senior Notes Claims.* The Plan provides that claims in Class 3, the Senior Notes claims, will receive their pro rata share of New Common Stock (including the New Common Stock that would otherwise be distributable to the holders of the Subordinated Notes and the Convertible Notes but for the subordination provision) and be afforded the right to participate in the rights offering. (*See* Plan at III.B.3). Even with the enforcement of the subordination

provisions, it is estimated that holders of Senior Notes Claims will receive a recovery of only approximately 55% of the value of their claim. (*See* Disclosure Statement at xiii).

*Class 4—Subordinated Notes Claims.* With respect to claims in Class 4, the 9% Subordinated Notes claims, the Plan provides that "Holders of Subordinated Notes Claims shall neither receive nor retain any property under the Plan, pursuant to the Subordinated Notes Indenture, which subordinate their right to payment to the right of holders of Senior Notes Claims to payment in full prior to any distribution being made to holders of 9% Subordinated Notes Claims." (*See* Plan at III.B.4). The Plan further provides that holders of 9% Subordinated Notes claims are not entitled to vote, as they are "conclusively deemed to reject the Plan." (*Id*).

*Class 6—Convertible Notes Claims.* Similarly, with respect to claims in Class 6, the Convertible Notes claims, the Plan provides that "Holders of Convertible Subordinated Debentures Claims shall neither receive nor retain any property under the Plan, pursuant to the Convertible Subordinated Indenture, which subordinates their right to payment to the right of holders of Senior Notes Claims to payment in full prior to any distribution being made to holders of Convertible Subordinated Debentures Claims." (*See* Plan at III.B.6). The Plan further provides that holders of Convertible Notes claims are not entitled to vote, as they are "conclusively deemed to reject the Plan." (*Id.*)

---

**3.** The Plaintiffs, separately, have filed other objections to the Plan. The Plaintiffs say they have not conceded that the Debtors' valuations are accurate, but have presented no valuation evidence in connection with the Motions. While not relinquishing any Plan ob-

jection to the Debtor's enterprise valuation, the Plaintiffs intend to present no witnesses at the confirmation hearing in support of any alternate valuation or otherwise. *See* Joint Pretrial Memorandum related to confirmation (main case docket no. 2383) at p. 65.

The Subordinated Notes are not permitted to participate in the Rights Offering. Any New Common Stock otherwise distributable to the Subordinated Noteholders will instead be distributed to the 8 5/8% Noteholders.

## DISCUSSION

### A. *BNY's Motion to Dismiss.*

■ As a threshold issue, BNY argues that the Plaintiffs do not have standing to bring this adversary proceeding because the Plaintiffs failed to allege in their complaint that they satisfied the procedural requirements of Section 6.06 of the Subordinated Notes Indenture, which provides as follows:

A Holder of a Note may pursue a remedy with respect to this Indenture or the Notes only if:

(a) the Holder of a Note gives to the Trustee written notice of a continuing Event of Default;

(b) the Holders of at least 25% in principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;

(c) such Holder of a Note or Holders of Notes offer and, if requested, provide to the Trustee indemnity satisfactory to the Trustee against any loss, liability or expense;

(d) the Trustee does not comply with the request within 60 days after receipt of the request and [*sic*] the offer and, if requested, the provision of indemnity; and

(e) during such 60–day period the Holders of a majority in principal amount of the then outstanding Notes do not give the Trustee a direction inconsistent with the request.

*See* Subordinated Notes Indenture, § 6.06. In response, the Plaintiffs argue that this section (known as a "no-action clause")

only applies to pursuit of a default remedy and, therefore, is not applicable to their declaratory judgment action. The term "remedy" is not defined in the Subordinated Notes Indenture and I disagree that the language in the indenture necessarily limits application of this provision to specific types of remedies. Furthermore, the Plaintiffs argue that they were not required to ask the indenture trustee (U.S. Bank) to bring the action because such a demand would be futile, since the deadlines for Plan confirmation prevent the Plaintiffs from waiting sixty days for the indenture trustee's response. Finally, the Plaintiffs also argue that the Court should hear this action under principles of judicial economy because they have asserted the same issue as a confirmation objection.

■ A no-action clause is a bargained-for contractual provision that inures to the benefit of both the issuer and the investors. *Feldbaum v. McCrory*, 1992 WL 119095, *5 (Del.Ch. June 2, 1992). The main purpose of a no-action clause is:

to deter individual debentureholders from bringing independent law suits for unworthy or unjustifiable reasons, causing expense to the Company and diminishing its assets. The theory is that if the suit is worthwhile, [a significant percent] of the debentureholders would be willing to join in sponsoring it. . . . An additional purpose is the expression of the principle of law that would otherwise be implied that all rights and remedies of the indenture are for the equal and ratable benefit of all holders.

*Feldbaum*, 1992 WL 119095, *6 *quoting* The American Bar Foundation's *Commentaries on Indentures*, § 5.7, at 232 (1971). Courts have recognized, however, that asking a trustee to take action may be excused if such a demand would be futile. *Cypress Assoc., LLC v. Sunnyside Cogeneration Assoc. Project*, 2006 WL 668441,

*6–*7 (Del.Ch. March 8, 2006) (The court decided that a no-action clause is an important, but surmountable, barrier to lawsuits that may be overcome when proceeding under the clause would be futile. The court held that asking a majority of bondholders or the trustee to bring an action to enforce minority rights would be futile and, therefore, was not barred by the no-action clause); *Ettlinger v. The Persian Rug and Carpet Co.*, 142 N.Y. 189, 193, 36 N.E. 1055 (N.Y.1894) (The court held that any emergency which makes a demand upon the trustee futile or impossible, and leaves the right of the bondholder without other reasonable means of redress, should justify allowing the bondholder to appear).

■ Parties should not be readily freed from the constraints of a clearly written no-action clause. However, dismissing the complaint at this juncture to allow the Plaintiffs to comply with the procedural requirements would only cause further delay. Moreover, at oral argument the parties indicated that the indenture trustee was unlikely to pursue this action, due to a failure to reach a satisfactory indemnification agreement.

■ The Plaintiffs argue correctly that, regardless of the no-action clause, they have a right to be heard on this issue at confirmation under Bankruptcy Code § 1109(b). The no-action clause's main purpose—to prevent the expense of unwarranted litigation—is not applicable to this adversary proceeding. As a practical matter, all of the parties consented to scheduling oral argument on this issue prior to the confirmation hearing and, further, expressed their interest in having this matter decided prior to confirmation, since a judgment against the Debtors on this issue would likely require—at the least—major revisions to the Debtors' Plan. Because dismissal of the complaint would not advance the interests of any party or further the purposes of the no-action clause, BNY's Motion to Dismiss, under these specific circumstances, will be denied.

B. **The Motions for Summary Judgment.**

(1) *Standard for Summary Judgment.*

■ Cross-motions for summary judgment do not require the court to grant summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed. *Manetas v. Int'l Petroleum Carriers, Inc.*, 541 F.2d 408, 413 (3d Cir.1976). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c), made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056. In a motion for summary judgment, the moving party "always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

(2) *The "X–Clause".*

■ All of the parties agree on the following principles:

1. The Subordinated Notes Indenture should be enforced in accordance with its terms;

2. The X–Clause is enforceable in bankruptcy. Bankruptcy Code § 510(a)[4];

3. The Court must look to state law—in this case the law of New York state—to interpret the Subordinated Notes Indenture and to determine the intent of the parties; and

4. The contract provisions at issue here are not ambiguous.[5]

It is also not disputed that the purpose of subordination provisions in the Subordinated Notes Indenture is to assure payment in full of the Senior Notes before there is any recovery on the Subordinated Notes.[6] The use and purpose of an x-clause was described by the court in *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136 (2d Cir.2005) as follows:

> Helpful guidance is found in the American Bar Foundations' *Commentaries on Model Debenture Indenture Provisions* (1971) [hereinafter *Commentaries].* In a nutshell, when subordinated and senior note holders are given securities under a plan of reorganization, an X–Clause allows the subordinated note holder to retain its securities only if the securities given to the senior note holder have higher priority to future distributions and dividends (up to the full amount of the senior notes). This provides for full payment of the senior notes before any payment of the subordinated notes is made. In such a case, the senior note holder enjoys unimpaired the priority to payment that it had under its notes, *i.e.,* payments on the subordinated note holder's securities are "subordinate ... to the payment of all Senior Indebtedness." *See Commentaries, supra,* § 14–5, at 570 (X–Clause is triggered where "mortgage bonds, preferred stock or similar higher class security" are provided to senior note holders and "common stock" is provided to subordinated note holders because "this kind of distribution gives practical effect to the subordination and therefore turnover is not required"); Ad Hoc Committee for Revision of the 1983 Model Simplified Indenture, *Revised Model Simplified Indenture,* 55 Bus. Law. 1115, 1221 (2000)("If Senior Debt were to receive preferred stock and the subordinated debt were to receive common stock, for example, where the preferred stock precluded distributions to common stockholders until the preferred stock was redeemed, the X–Clause would permit that distribution."). This approach assures that the junior creditor remains fully subordinated without requiring it to yield assets that are not required for full payment of the senior creditor and that would therefore make a round-trip to the senior creditor and back with the attendant delay, friction, and transaction cost.

---

4. Section 510(a) provides: (a) A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

5. "[W]hen opposing parties agree that the document whose meaning they dispute is not ambiguous, all they mean is that they are content to have its meaning determined without the help of extrinsic evidence." *Envirodyne,* 29 F.3d at 304.

6. The Plaintiffs, curiously, do not concede that the 8 5/8% Notes are senior to the 9% Notes, but assert that such a determination is not necessary to decide their Motion for Summary Judgment. Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment (docket no. 25) at p. 2 n. 2. In any event, the Plaintiffs advance no specific basis for a challenge to the seniority of the 8 5/8% Notes.

*Metromedia,* 416 F.3d at 139–140 (footnote omitted).[7]

The best summary of the Plaintiffs' arguments is contained in their Reply Memorandum of Law in Support of their Motion for Summary Judgment (docket no. 45)(the "Plaintiffs' Reply"):

> Plaintiffs' argument is straightforward: they are entitled to receive New Common Stock because, by operation of the unconditional and absolute obligation of the Debtors to repay the 9% Notes and Section 1129(b) of the Bankruptcy Code, the 9% Notes must receive the same distribution as any other general unsecured creditor of the Debtors, unless there is some basis for disparate treatment of the 9% Notes. The subordination provisions of the 9% Indenture provides this basis in most circumstances; however, Permitted Junior Securities are unambiguously excepted from the subordination provisions by the X–Clause, and therefore holders of the 9% Notes may receive such securities *even if the 8 5/8% Notes have not yet received payment in full.* Because New Common Stock and the Rights Offering clearly fall within the definition of Permitted Junior Securities, Plaintiffs and all other holders of the 9% Notes must share in the distribution of New Common Stock and be permitted to participate in the Rights Offering on a *pari passu* basis with holders of the 8 5/8% Notes. Otherwise, the Plan is in clear violation of section 1129(b) of the Bankruptcy Code [prohibiting unfair discrimination between classes of creditors of equal priority].

Plaintiffs' Reply at p. 1 (emphasis in original).

The key to this position rests upon the Plaintiffs' assertion that the Subordinated

---

**7.** The Plaintiffs contend that, in this exercise, the Court should not consider any source outside of the "four corners" of the indenture. The *Metromedia* Court noted that it was appropriate to consider the *Commentaries* and that it had done so to interpret indenture provisions in other cases. *See, e.g., Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.,* 838 F.2d 66, 71–72 (2d Cir.1988); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.* 691 F.2d 1039, 1048–50 (2d Cir.1982). *Metromedia,* 416 F.3d at 139 n. 2.

The Seventh Circuit Court of Appeals was even more detailed in its defense of the use of the *Commentaries* in *Envirodyne:*

> The rule that bars the introduction of extrinsic evidence when a contractual provision is more or less clear "on its face" (e.g., *Patton v. Mid–Continent Systems, Inc.,* 841 F.2d 742, 745 (7th Cir.1988); *Coplay Cement Co. v. Willis & Paul Group,* 983 F.2d 1435, 1438–39 (7th Cir.1993)) instantiates the broader principle that (with exceptions unnecessary to consider here) parol or extrinsic evidence is admissible to interpret but not to contradict or alter the written contract. 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.12, pp. 272–73 (1990). If the written contract is clear without extrinsic evidence, then such evidence could have no office other than to contradict the writing, and is therefore excluded. The object in excluding such evidence is to prevent parties from trying to slip out of their clearly stated, explicitly assumed contractual obligations through self-serving testimony or documents-which, though self-serving, might impress a jury-purporting to show that the parties didn't mean what they said in the written contract. Contractual obligations would be too uncertain if such evidence were allowed. But dictionaries, treatises, articles, and other published materials created by strangers to the dispute, like evidence of trade usage, which is also admissible because it is also evidence created by strangers rather than by a party trying to slip out of a contractual bind, do not present a similar danger of manufactured doubts and are therefore entirely appropriate for use in contract cases as interpretive aids. Appropriate, and sometimes indispensable. It would be passing odd to forbid people to look up words in dictionaries, or to consult explanatory commentaries that, like trade usage, are in the nature of specialized dictionaries.

*Envirodyne,* 29 F.3d at 305.

Notes Indenture's definition of "Permitted Junior Securities" sets forth phrases (1) and (2) as independent clauses. This interpretation rests on the use of a semicolon and the word "or" at the end of phrase (1), a blank line, and the break which separates phrase (2). The consequence of this reading places "Equity Interests" within the definition without qualification, while "debt securities," the subject of phrase (2), are "Permitted Junior Securities" only if subordinated to the Senior Notes. Since the term "Equity Interests" would include, in this case, the distribution of New Common Stock and the right to participate in the Rights Offering, the Plaintiffs claim that the X–Clause exception to subordination applies, and the Subordinated Noteholders are entitled to retain their share of the Plan's distribution to general unsecured creditors.[8]

The Defendants respond to this by pointing out that "every subordinated noteholder that has litigated this issue has made precisely the same argument ..." and lost. *See* Reply Memorandum of BNY (docket no. 42) at p. 23. The Defendants cite to three reported decisions (and one unreported decision) in support of this view. All three reported decisions are by circuit courts of appeals.

In *In re Envirodyne Industries, Inc.*, 161 B.R. 440, 447 (Bankr.N.D.Ill.1993), *aff'd*, 29 F.3d 301 (7th Cir.1994), the x-clause at issue provided that:

> all Superior Indebtedness shall first be paid in full before the Noteholder ... shall be entitled to retain any assets (other then [sic] shares of stock of the Company, as reorganized or readjusted

or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, *the payment of which is subordinated, at least to the same extent as the Notes, to the payment of all Superior Indebtedness which may at the time be outstanding*) ...

*Envirodyne*, 161 B.R. at 444 (emphasis added). The proposed plan in *Envirodyne* provided that both the junior and senior debt would receive common stock of the reorganized company, but that the senior debt would receive the common stock initially allocated to the junior debt as a result of subordination. *Envirodyne*, 161 B.R. at 443–44. The junior debtholders objected to confirmation of the plan arguing, as Plaintiffs do here, that they were entitled to receive stock in the reorganized company on the same basis as the senior debt because, under the terms of the x-clause at issue there, a distribution of "shares of common stock" (as opposed to a distribution of "securities") was not subject to subordination. *Id.* The junior debtholders argued that the clause beginning "the payment of which" applied only to "securities of the Company," and not to "shares of stock of the Company." *Id.* at 447. Plaintiffs advance a similar argument here.

The *Envirodyne* Bankruptcy Court rejected this purely grammatical interpretation, finding that the junior debt "fail[ed] to read the 'X' clause as a whole and that their interpretation ignore[d] the intent and plain meaning of a subordination agreement." *Id.* at 447. The bankruptcy court reasoned that an " 'X' clause ... provides a method for junior debtholders to retain existing shares of stock or new

---

8. The term "Equity Interests" is defined in the Subordinated Notes Indenture as "Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock)". Subordinated Notes Indenture, § 1.01. The definition of the term "Capital Stock" states that it includes "in the case of a corporation, corporate stock." *Id.*

shares of stock in a reorganized company allocated to them pursuant to a plan of reorganization *in the event the senior indebtedness is paid in full or receives stock or securities that is senior to that received by the junior noteholders.*" *Id.* at 446 (emphasis added)(*citing* Edward Everett, *Analysis of Particular Subordination Provisions,* 23 Bus. Law. 41, 44 (1967)). The *Envirodyne* Bankruptcy Court went on to hold that the x-clause "insur[es] that in a reorganization, the holders of [senior debt] receive payment in full, regardless of the form of consideration, before the [junior debtholders] are paid any consideration." *Id.* at 448.

The Seventh Circuit affirmed on appeal. In so doing, Judge Posner conceded, in his opinion for the panel, that the x-clause at issue there was poorly drafted. *Envirodyne,* 29 F.3d at 306. In fact, he acknowledged the possibility that "[o]n balance the [subordinated noteholders] have the better of the purely semantic argument" as to the significance of the grammar used in the drafting of the x-clause. *Id.* at 305. However, he rejected the appropriateness of such an "entirely grammatical and semantic" argument because "it makes no sense once the context of the terminology being used is restored." *Id.*

■ Despite an invitation extended by this Court at oral argument, neither BNY nor the Debtor would acknowledge that the X–Clause at issue here was poorly drafted. However, like the x-clause in *Envirodyne,* the X–Clause here, while not legally ambiguous, lacks the utter clarity that BNY and the Debtor would now surely prefer. But, like the *Envirodyne* courts, in interpreting the contract language before me, I will: *"read the contract as a whole* and consider all parts of the whole and not give undue force to certain words or phrases that would distort or confuse the primary and dominant purpose of the contract." *Envirodyne,* 161 B.R. at 445 (*citing Empire Props. Corp. v. Mfrs. Trust Co.,* 288 N.Y. 242, 248, 43 N.E.2d 25, 28 (1942)) (emphasis added). *See also id.* at 445–46. (noting that "courts should construe an indenture as a whole to carry out the plain purpose and object of the indenture and *not limit itself to literal interpretations.*")(emphasis added). The *Envirodyne* courts were also applying the rules of New York contract interpretation that this Court must apply here. *See id.* at 445 (noting applicability of New York law).

■ The X–Clause must be read in context. When read as a whole, the Subordinated Note Indenture clearly manifests the intent to assure payment in full of the Senior Notes before permitting payment (in whatever form) to the Subordinated Noteholders. The Plaintiffs argue, in counterpoint, that the purpose of an x-clause is to carve out certain distributions from the otherwise applicable subordination provisions. Therefore, the X–Clause should be read generously in favor of those who are its intended beneficiaries so as to give the fullest effect to this intention. This argument must fail because an x-clause, as a general proposition, creates only limited exceptions to the otherwise applicable subordination provisions and, therefore, must be read narrowly, and in harmony, with the entire contract. This principle applies equally to the X–Clause at issue here.

In an opinion authored by the late Chief Judge Becker, the Third Circuit Court of Appeals followed *Envirodyne.* *In re PWS Holding Corp.,* 228 F.3d 224 (3d Cir.2000). In *PWS,* the debtor's plan provided no distribution to a subordinated noteholder. The subordinated noteholder argued that the x-clause created an affirmative obligation by the debtor to distribute securities, so long as the securities distributed to the subordinated noteholder were junior to

those issued to senior debt. *Id.* at 244–245. The x-clause in *PWS* provided:

> [u]ntil all Obligations with respect to Senior Indebtedness (as provided in Subsection above) are paid in full in cash or cash equivalent, any distribution to which holders would be entitled but for this article shall be made to holders of Senior Indebtedness (except that Holder may receive ... securities that are subordinated to at least the same extent as the Securities to (a) Senior Indebtedness and (b) any securities issue [sic] in exchange for Senior Indebtedness), as their interests may appear.

*Id.* at 244. The Court, citing the *Envirodyne* decision, explained that the purpose of the x-clause was to avoid the cumbersome procedure that would require junior creditors to pay over securities received pursuant to a plan of reorganization and then take the securities back once the senior creditors were paid in full. *Id.*

The Plaintiffs contend that *PWS* is not dispositive of this dispute because *PWS* involved a dispute over whether the x-clause at issue there *required* the debtor, when making a distribution to senior debt that was not excluded by the x-clause from the subordination provisions, to make a separate and distinct subordinated distribution to the junior creditors of a different class of security. Plaintiff's Reply at p. 3. The Plaintiffs further argue:

> Here, the issue is quite different: whether a single class of securities the Debtors are issuing under their plan (the New Common Stock and the right to purchase the same through the Rights Offering) is exempted by the X–Clause from the general rule of subordination in Article 10 of the 9% Indentures, and must therefore be distributed pro rata to the holders of the 9% Notes because of the requirements of section 1129(b) of the Bankruptcy Code..... Section 1129(b)'s prohibition of unfair discrimination mandates that holders of the 9% Notes receive the distribution of New Common Stock and the right to participate in the Rights Offering. *PWS* would only support Defendants' position if the Debtors were proposing to make a distribution of something other than Permitted Junior Securities only to the holders of the 8 5/8% Notes, and Plaintiffs were arguing that the Debtors were nevertheless required by the X–Clause to also distribute Permitted Junior Securities to holders of the 9% Notes.

*Id.* The Plaintiffs' position conflates two related, but distinct, analyses: (1) proper interpretation of state law contract rights, including the subordination provisions and the X–Clause, and (2) Section 1129(b)'s prohibition of unfair discrimination. Notwithstanding the Debtors' state law obligation to repay the Subordinated Noteholders, the X–Clause cannot be read in conjunction with these rights and the prohibition in Section 1129(b)(1) to require the Debtor to propose a distribution to the Subordinated Noteholders.

The Plaintiffs also resist the Defendants' comparison of the X–Clause now before the Court with those considered in *Envirodyne* and *Metromedia*, and argue: [9]

9. The Defendants also rely on an unreported Bench decision by Bankruptcy Judge Gerber in *In re Adelphia Communications Corp.*, No. 02–41729 (Bankr.S.D.N.Y. April 6, 2006), a copy of which transcript was provided to this Court. I do not know what precedential value my well-respected colleague attributes to his Bench rulings. I attribute none to my own and often caution litigants before me of this view. Therefore, I will not rely on the *Adelphia* decision, especially since the transcript reflects Judge Gerber's intention to follow "with a more extensive ruling to be issued in writing thereafter." Transcript of

[T]he *Metromedia* court called the x-clause before it "not self-reading; the applicability of the clause in a specific case is not readily apparent...." 416 F.3d at 139. The only thing missing here is actual use of the word "ambiguous." Similarly, the *Envirodyne* court, although stating at one point that "the meaning of the clause is plain," 29 F.3d at 304, also described the x-clause before it as "poorly drafted," *id.* at 306, and used policy considerations to reach a result contrary to "the better ... semantic argument," 29 F.3d at 305–06. In other words, neither court was actually applying a "plain meaning" analysis to clearly drafted language, as is required by New York law when meaning is in fact plain. (*See* Pls.' Summ.J.Br. Pp. 11–13) ... Here, the X–Clause is "self-reading," and it is not poorly drafted. Indeed, Plaintiffs are not urging the "better semantic argument," they are urging the *only* semantic argument.

Plaintiffs' Reply at pp. 6–7. Neither of these courts found the x-clause at issue to be ambiguous. Rather, as with the X–Clause now before me, the draftsmanship falls somewhere outside of the realm of utter clarity, yet not quite in the region of ambiguity. The comparison of *Envirodyne, Metromedia* and *PWS* to the dispute before me is entirely apt, to some extent for the similar, but differing, language and structure of the various x-clauses, but perhaps more so for the approach taken by each of these courts in interpreting the contract language before them.

---

April 6, 2006 hearing in *Adelphia* at p. 55. *See also id.* at p. 62.

**10.** *See also* the Court of Appeals opinion in *Envirodyne,* 29 F.3d at 306: "The purpose of the clause ... bears no relation to the interpretation for which the [subordinated noteholders] contend, under which the senior

Plaintiffs argue, correctly, that each x-clause is different and must be considered only in the specific context of the applicable contract. Considering the X–Clause before me, I conclude that it must not be considered based upon its grammatical structure alone, but also within the context of the entire agreement, which, here, is more reflective of the parties' intent: that except in very limited circumstances, no payment can be made to the Subordinated Noteholders until (1) the Senior Notes are paid in full, or (2) the Senior Noteholders consent. Neither circumstance is present here. I conclude that the language which follows the words "debt securities" in phrase (2) of the "Permitted Junior Securities" definition modifies both phrase (1) and phrase (2). To interpret the X–Clause to include the New Common Stock and the Rights Offering in the definition of "Permitted Junior Securities" would eviscerate the purpose of the subordination provisions in the Subordinated Notes Indenture and expand the limited carve out beyond its intended scope. As the bankruptcy court in *Envirodyne* said, the interpretation advanced by the Subordinated Noteholders "defies explanation and logic. A senior creditor simply would not agree to a subordination agreement in which its priority depended upon the form of consideration chosen by the debtor." *Envirodyne,* 161 B.R. at 448.[10]

(3) *Section 1129(b)'s Prohibition of Unfair Discrimination.*[11]

 The Subordinated Note Indenture requires nothing of the Debtor in this case,

---

creditors' priority would depend on the form of distribution."

**11.** Bankruptcy Code § 1129(b)(1) provides:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) [regarding acceptance of the

but this does not necessarily end the analysis. *In re Exide Technologies*, 303 B.R. 48, 78 (Bankr.D.Del.2003)(To confirm a plan, the debtor must show there is a reasonable basis for the debtor's separate classification of general, unsecured creditors and that the debtor cannot confirm a plan absent separate classification of unsecured creditors.) As discussed in *Matter of Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr.D.Del.2001):

> The concept of unfair discrimination is not defined under the Bankruptcy Code. Various standards have been developed by the courts to test whether or not a plan unfairly discriminates. *In re Dow Corning Corp.*, 244 B.R. 705, 710 (Bankr.E.D.Mich.1999), *aff'd* 255 B.R. 445 (E.D.Mich.2000). The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination. *See, e.g., In re Ambanc La Mesa L.P.*, 115 F.3d 650, 656 (9th Cir.1997) *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

*Genesis Health Ventures*, 266 B.R. at 611.

██ Although some commentators have argued in favor of limiting a debtor's ability to discriminate among creditors of the same priority level, they have agreed that discrimination based upon subordination rights is viewed as fair. *See Steven M. Abromowitz, et al., Making The Test For Unfair Discrimination More "Fair": A Proposal*, 58 Bus.Law. 83, 107 (Nov.2002)(Arguing that the case law regarding unjust discrimination is too unpredictable and inconsistent, and proposing an

approach postulated by Professor (now Bankruptcy Judge) Bruce A. Markell which "would prohibit discrimination in amount of recovery subject to two exceptions, enforcing subordination rights and rewarding a reasonable equivalent contribution in money or money's worth.") Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr.L.J. 227 (1998).

The Debtor argues that an adverse ruling on these Motions would render the Debtor unable—over the opposition of the Senior Noteholders—to confirm any plan which would eliminate the subordination and provide *pari passu* treatment of the Subordinated Noteholders. *See* Answering Brief of Defendants–Debtors in Opposition to Plaintiff's Motion for Summary Judgment (docket no. 25) at pp. 22–23. The Plaintiffs respond:

> Not only is this statement based, quite inappropriately, on pure conjecture and not on any uncontroverted evidence before this Court, it also has absolutely nothing to do with the legal issue to be decided by this Court. The practical effect that a determination that the New Common Stock and the Rights Offering are excepted from the subordination provisions of the 9% Indentures and must be distributed on a *pro rata* basis to all unsecured creditors would have on the Plan the Debtors are currently seeking to confirm, or indeed their ability to confirm any plan, is simply not relevant to the determination of the correct interpretation of the X–Clause. The Court ... cannot, as the Debtors ask, consider the consequences of such an application and then work backward to an interpre-

---

plan by impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not dis-

criminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
11 U.S.C. § 1129(b)(1).

tation that allows the outcome the Debtors prefer.

Plaintiffs' Reply at pp. 10–11. Based upon the Plaintiff's position, then, for purposes of disposition of the Motions now before me, I will not consider this factor.

### CONCLUSION

For all of the above reasons, the Plaintiff's Motion for Summary Judgment will be denied. BNY's Motion will be denied, in part, with respect to its request to dismiss the adversary complaint, and will be granted, in part, with respect to its request for summary judgment. Finally, the Debtor–Defendants' Motion for Summary Judgment will be granted. An appropriate Order follows.

### ORDER

AND NOW, this 7th day of December, 2007, upon consideration of the following motions: (1) The Motion by The Bank of New York Trust Company, N.A. to dismiss Adversary Proceeding, or, in the Alternative, for Summary Judgment (the "BNY Motion") (docket no. 14); (2) The Defendant–Debtors' Motion for Summary Judgment (docket no. 19); and (3) The Plaintiffs' Motion for Summary Judgment (docket no. 24), and the respective responses and replies thereto, and after oral argument thereon, and for the reasons set forth in the accompanying Memorandum, if is hereby **ORDERED** and **DECREED** as follows:

(1) The BNY Motion is **DENIED,** in part, with respect with its request to dismiss the adversary complaint and **GRANTED,** in part, with respect to its request for summary judgment;

(2) The Debtors' Motion for Summary Judgment is **GRANTED;** and

(3) The Plaintiffs' Motion for Summary Judgment is **DENIED.**

Accordingly, judgment in this adversary proceeding is hereby entered **AGAINST** the Plaintiffs and in **FAVOR** Of the Defendants.